Brian F. WEBER, Individually and on behalf of all other persons similarly situated

v.

KAISER ALUMINUM & CHEMICAL CORP. and United Steelworkers of America AFL–CIO.

Civ. A. No. 74–3510.

United States District Court,
E. D. Louisiana.

June 17, 1976.

Michael R. Fontham, Stone, Pigman, Walther, Wittmann & Hutchinson, New Orleans, La., for Brian F. Weber and the class he represents.

F. W. Middleton, Jr., Taylor, Porter, Brooks & Phillips, Baton Rouge, La., for Kaiser Aluminum & Chemical Corp.

John C. Falkenberry, Cooper, Mitch & Crawford, Birmingham, Ala. and Jerry L. Gardner, Jr., Dodd, Barker, Boudreaux, Lamy & Gardner, New Orleans, La., for United Steelworkers of America, AFL–CIO, defendant.

JACK M. GORDON, District Judge:

This civil action seeks relief from the effects of alleged illegal discriminatory employment practices by Kaiser Aluminum & Chemical Corporation (hereinafter referred

to as "Kaiser"). A trial was scheduled on plaintiffs' request for a preliminary injunction; however, by stipulation of all of the parties the trial was conducted on the merits of plaintiffs' request for a permanent injunction. This opinion, therefore, relates solely to plaintiffs' prayer for injunctive relief against provisions incorporated by Kaiser in its current collective bargaining agreement, as such provisions pertain to Kaiser's employment practices at its plant located at Gramercy, Louisiana. Plaintiffs contend that these provisions establish a quota system which illegally discriminates against non-minority members of the Kaiser Gramercy labor force in violation of Title VII of the Civil Rights Act of 1964.

Brian F. Weber, the individual plaintiff and class representative, has been an employee for Kaiser for approximately seven years, and is presently working as a laboratory analyst at Kaiser's plant in Gramercy. It appears that Mr. Weber has assumed an active role in the plant's employee-employer relationship inasmuch as he has recently become the chairman of the plant's grievance committee and has also served as a member of the negotiating committee, formed to supply a local supplement to the 1974 Master Labor Agreement, details of which will be discussed later. The plaintiff also is an active member of the United Steelworkers of America Labor Union, AFL–CIO, Local 5702.

In addition to presenting his own claim, Mr. Weber is serving as representative of a class of workers who have similar grievances. This class has been previously defined to include the following employees:

"All persons employed by Kaiser Aluminum & Chemical Corporation at its Gramercy, Louisiana, works who are members of the United Steelworkers of America, AFL–CIO Local 5702, who are not members of a minority group, and who have applied for or were eligible to apply for on-the-job training programs since February 1, 1974."

Accordingly, the plaintiffs herein consist of Mr. Brian Weber and the class of employees as described above.

The defendants are Kaiser Aluminum & Chemical Corporation, a corporation organized under the laws of the State of Delaware, with its principal place of business in the State of California, and the United Steelworkers of America AFL–CIO (hereinafter referred to as USWA). The USWA is a labor organization created to champion the rights of its members and to bring to bear greater influence upon management during labor negotiations. In the instant case, the USWA is the certified representative of the employees of Kaiser at the Gramercy, Louisiana plant.

On February 1, 1974, Kaiser and USWA entered into an agreement called the "1974 Labor Agreement," which specified hourly wages, hours of work, and conditions of employment. Of particular significance here are the provisions of this collective bargaining agreement relative to minority representation in the trade, craft and assigned maintenance classifications. The pertinent portions of the contract provide:

It is further agreed that the Joint Committee will specifically review the minority representation in the existing Trade, Craft and Assigned Maintenance classifications, in the plants set forth below, and, where necessary, establish certain goals and time tables in order to achieve a desired minority ratio:

[Gramercy Works listed, among others] As apprentice and craft jobs are to be filled, the contractual selection criteria shall be applied in reaching such goals; at a minimum, not less than one minority employee will enter for every non-minority employee entering until the goal is reached unless at a particular time there are insufficient available qualified minority candidates . . .

\*     \*     \*     \*     \*     \*

The term "minority" as used herein shall be as defined in EEOC Reporting Requirements.

(See: Joint Exhibit # 1, "1974 Labor Agreement," pp. 164–165.)

These portions of the contract are found in an addendum to Article 9 thereof, which

Article deals with "seniority." The "Joint Committee" thereafter entered into a "Memorandum of Understanding"[1] which established a goal of thirty-nine percent as the percentage of minorities that must be represented in each "craft family" at the Kaiser Gramercy plant.[2]

In April, 1974, Kaiser offered bids for on-the-job training opportunities in the craft families of *instrument repairman, electrician*, and *general repairman*. Following the terms of the 1974 Labor Agreement, one black and one white employee were selected on the basis of seniority within their respective racial groups for the vacancies in the instrument repairman category. Similarly, two trainees, one black and one white, were selected for training in the electrician category, and five trainees, three of whom were black, were selected for the general repairman positions. In each of these three cases, the most senior man in his racial group was selected, but in each case one or more white employees not selected had greater seniority and would have been selected had the quota system not been in effect.

In October, 1974, Kaiser posted additional bids for on-the-job training opportunities, this time in the category of *insulator* and *carpenter*. According to Mr. Weber's testimony, the vacancy in the insulator category was filled by a black employee, since the bid was restricted to blacks only. In the category of carpenter, one black and one white were selected.

It has been admitted by Kaiser that members of minority groups with less seniority than Mr. Weber and other members of the class were selected by Kaiser for these programs specifically to meet the established goal of at least thirty-nine percent minority representation in each craft family.

Kaiser operates many plants throughout the country, but for the purposes of this litigation, we are only concerned with the Labor Agreement as it affects employment practices at the plant located in Gramercy, Louisiana. Mr. Dennis E. English, Kaiser's Industrial Relations Superintendent at the Gramercy plant, testified that the great majority of all employees at this plant were hired from the adjacent parishes of St. James and St. John the Baptist. According to census figures, approximately forty percent of the total population of these Parishes are members of minority groups. It was also established by the testimony of Mr. English that minority employees at the Gramercy plant accounted for only 14.8 percent of the total labor force at that plant, and that in an attempt to increase this percentage to conform more closely to the percentage of the general population of the community, Kaiser began to hire new employees "at the gate" on a "one white, one black" basis in 1969. The evidence further established that Kaiser had a no-discrimination hiring policy from the time its Gramercy plant opened in 1958, and that none of its black employees who were offered on-the-job training opportunities over more senior white employees pursuant to the 1974 Labor Agreement had been the subject of any prior employment discrimination by Kaiser.

With regard to craft positions, Mr. English testified that prior to 1974, only five blacks had been hired into these positions, making the black craft population only 2–2½ percent of the total Gramercy plant craft population. Although this figure might suggest that Kaiser had discriminated against blacks when filling craft positions, Mr. English testified that prior to 1974, Kaiser had vigorously sought trained black craftsmen from the general community. Although its efforts to secure such trained employees included advertising in periodicals and newspapers published primarily for black subscribers, Kaiser found it difficult, if not impossible, to attract trained black craftsmen.

Moreover, it is apparent from the evidence that Kaiser's decision to bargain for the herein controverted quota system in the 1974 Labor Agreement, which quota system

1. Joint Exhibit # 2.

2. Joint Exhibit # 2, p. 8, and Exhibit B thereto.

applies on a nationwide basis, was prompted not only by its desire to increase the per-centage of its black craftsmen, and afford more job opportunities to blacks, but also by its concern about compliance with rules and regulations issued by the Office of Federal Contract Compliance (OFCC), an agency of the Executive Branch of the U. S. Government. There is no evidence that Kaiser, in incorporating this quota system in the 1974 Labor Agreement, did so with a view toward correcting the effects of prior discrimination at any of the fifteen plants to which the system had application. To the contrary, it appears that satisfying the requirements of OFCC, and avoiding vexatious litigation by minority employees, were its prime motivations. The plaintiffs here contend that as the quota system affects the Gramercy plant it unlawfully prefers black employees who have never been subject to prior discrimination by Kaiser.

The defendants' initial contention is that seniority rights are derived from collective bargaining agreements, and, thus, are contractual rights which are not properly the subject of Title VII of the Civil Rights Act of 1964.

■ This Court is aware of the fact that seniority rights are not vested, but rather derive their scope and significance from union contracts. Furthermore, it is well established that seniority rights are subject to alteration with each successive collective bargaining agreement, since seniority is a valid subject matter for the collective bargaining process. *Ferrara v. Pacific Intermountain Express Company*, 301 F.Supp. 1240 (N.D.Illinois, E.D.1969); *Schick v. N.L.R.B.*, 409 F.2d 395 (7th Cir. 1969).

■ On the other hand, a union or company cannot lawfully bargain for the establishment or confirmation of unlawful discriminatory practices. *Emporium Cazwell Co. v. Western Addition Community Organization*, 420 U.S. 50, 95 S.Ct. 977, 43 L.Ed.2d 12 (1975).

■ Because the plaintiffs contend that the collective bargaining agreement establishes a quota system which is in violation of the Civil Rights Act of 1964, this Court has the authority and jurisdiction to consider their claims even though the quota system was the product of a labor-management agreement.

In its consideration of Plaintiffs' claims under the 1964 Civil Rights Act, this Court will be concerned only with Title VII of such Act which made the elimination of employment discrimination based on race, color, religion, sex or national origin in all industries affecting interstate commerce an avowed objective of the Federal Government. This endeavor is reflected in Section 703(a) of Title VII [42 U.S.C. § 2000e–2(a)], which reads:

(a) It shall be unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

Discrimination against any individual on the basis of race in any apprenticeship or training program is also specifically prohibited by Section 703(d) [42 U.S.C. § 2000e–2(d)], which provides:

(d) It shall be an unlawful employment practice for any employer, labor organization, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs to discriminate against any individual because of his race, color, religion, sex, or national origin in admission to, or employment in, any program established to provide apprenticeship or other training.

During the lengthy debates which preceded this legislation, many employers and legislators expressed fear that the equal employment provisions of the 1964 Civil Rights Act would be construed to require the hiring of minority group personnel on the basis of quotas in order to rectify existing imbalances in employment. To placate these concerns, Section 703(j)[3] was placed in the Act as a compromise, so as to clarify that the equal employment provisions of the 1964 Act were not intended by the Congress to require that preferential treatment be given any individual or group because of an imbalance that might exist with respect to the total number or percentage of persons of any race, color, religion or sex employed in comparison with the total number or percentage of such persons in that area. See generally, *The Civil Rights Act of 1964*, BNA Operations Manual (1964).

■ In this case Kaiser asserts support for the discrimination against its white employees brought about by its aforesaid affirmative action program in the fact that Section 703(j), while providing that the equal employment provisions of the 1964 Act were not to be interpreted as requiring quotas, does not, within the four corners of that subsection, prohibit quotas in employment or training programs.

After careful consideration of the legislative history of the 1964 Act, and all available jurisprudence, this Court must conclude that such an inference as Kaiser would draw from Section 703(j) cannot override the clear and unequivocal prohibitions against discrimination by an employer against any individual on the basis of race, or color in employment or training programs contained in Sections 703(a) and

703(d) of the Act. Moreover, there is absolutely nothing in the legislative history of the Act to support such an inference. It is clear that the Congress was aware of the concept of affirmative action programs during its considerations, and that it did not choose to exempt what many consider the salutary or benign discrimination of such programs from its sweeping prohibitions against racial discrimination by an employer against any individual.

Kaiser further seeks to justify the racially discriminatory effects of the quota system which it has adopted by analogizing its affirmative action program to those mandated by United States Courts in response to lawsuits brought by minority group employees under the provisions of Title VII of the Civil Rights Act. It would be well, therefore, briefly to review the history of such court involvement.

After the effective date of the 1964 Act, the courts were deluged with cases alleging employment discrimination, and were left to impose relief commensurate with the nature of the violation. In *Louisiana v. United States*, 225 F.Supp. 353, 393, aff'd 380 U.S. 145, 85 S.Ct. 817, 13 L.Ed.2d 709 (1965) the Supreme Court for the first time considered the scope of authority of the judiciary to fashion such relief. Its conclusion was that the courts had not only the power but the duty to render decrees which would "eliminate the discriminatory effects of the past as well as bar like discrimination in the future." *Louisiana v. United States, supra*, at 380 U.S. 154, at 85 S.Ct. 822.

The lower courts thereafter began exercising this authority realizing that in some cases affirmative action programs were necessary to effectuate the purpose of the

**3.** Section 703(j), 42 U.S.C. § 2000e–2(j) reads:

(j) Nothing contained in this subchapter shall be interpreted to require any employer, employment agency, labor organization, or joint labor-management committee subject to this subchapter to grant preferential treatment to any individual or to any group because of the race, color, religion, sex, or national origin of such individual or group on account of an imbalance which may exist with respect to the total number or percentage of persons of any race, color, religion, sex, or national origin employed by any employer, referred or classified for employment by any employment agency or labor organization, admitted to membership or classified by any labor organization, or admitted to, or employed in, any apprenticeship or other training program, in comparison with the total number or percentage of persons of such race, color, religion, sex, or national origin in any community, State, section, or other area, or in the available work force in any community, State, section, or other area.

1964 Act. For example, in the case of *Local 53 of Int. Ass'n. of Heat & Frost Insulators & Asbestos Workers v. Vogler*, 407 F.2d 1047 (5th Cir. 1969), the Court explained:

"In formulating relief from such practices the courts are not limited to simply parroting the Act's prohibitions but are permitted, if not required, to 'order such affirmative action as may be appropriate.' See *United States v. Louisiana*, E.D.La.1963, 225 F.Supp. 353, 393, aff'd, 1965, 380 U.S. 145, 154, 85 S.Ct. 817, 13 L.Ed.2d 709." *Vogler, supra*, at p. 1052.

Additionally, the Court said in *Vogler*:

"Where necessary to ensure compliance with the Act, the District Court was fully empowered to eliminate the present effects of past discrimination. *United States v. Local 189, United Papermakers & Paperworkers*, E.D.La.1968, 282 F.Supp. 39, 45; *Quarles v. Philip Morris, Inc.*, E.D.Va.1968, 279 F.Supp. 505, 516. See also *Louisiana v. U. S.*, 1965, 380 U.S. 145, 154, 85 S.Ct. 817, 13 L.Ed.2d 709." *Vogler, supra*, at pp. 1052, 1053.

*cf. United States v. United Bro. of Carpenters & Joiners of America, Local 169*, 457 F.2d 210 (7th Cir. 1972).

As in the *Vogler* case, the courts most frequently exercised their authority to fashion affirmative relief in cases where the employment scheme in question was found to be neutral on its face, but had the effect of perpetuating the effects of past discrimination. See *United States v. Wood, Wire and Metal Lath. Int. v. Loc. No. 46*, 471 F.2d 408 (2d Cir. 1973); *United States v. Central Motor Lines, Inc.*, 325 F.Supp. 478 (W.D.N. C.1970); *United States v. Ironworkers Local 86*, 443 F.2d 544 (9th Cir. 1971), cert. denied, 404 U.S. 984, 92 S.Ct. 447, 30 L.Ed.2d 367 (1971).[4]

As the courts began to impose quota systems and other affirmative action programs on a case-by-case basis, however, many employers contested such authority arguing that Sec. 703(j) of the Civil Rights Act

prohibited anyone from granting preferential treatment to a given class.

In the case of *United States v. International Bro. of Electrical Workers Local No. 38*, 428 F.2d 144 (6th Cir. 1970), the Court explains the seemingly incongruent relationship between affirmative relief and preferential treatment thusly:

"When the stated purposes of the Act and the broad affirmative relief authorization above are read in context with § 2000e–2(j), we believe that section cannot be construed as a ban on affirmative relief against continuation of effects of past discrimination resulting from present practices (neutral on their face) which have the practical effect of continuing past injustices." *Int'l Bro. of Electrical Workers, supra*, at p. 149.

Accordingly, from the principles espoused in *Louisiana v. United States, supra*, and its progeny, it is well established that the judiciary may establish affirmative action programs as a form of relief in certain Title VII cases without running afoul of sections 703(a), 703(d) or 703(j) of the 1964 Act.

At first blush, it might appear inconsistent that the Act on one hand makes unlawful the establishment by employers of affirmative action programs while on the other hand permits, if not requires, the courts to fashion similar relief in certain cases. Upon reflection, however, substantial distinctions become apparent.

■ The most important and obvious distinction is the fact that Sections 703(a) and (d) of Title VII do not prohibit the courts from discriminating against individual employees by establishing quota systems where appropriate. The proscriptions of the statute are directed solely to employers.

There are other logical and compelling reasons for distinction between employer action and court action. First, because relief of this nature should be imposed with extreme caution and discretion, and only in

---

**4.** See also, *Carter v. Gallagher*, 452 F.2d 315 (8th Cir. 1971), cert. denied, 406 U.S. 950, 92 S.Ct. 2045, 32 L.Ed.2d 338 (1972); *Contractors Association of Eastern Pennsylvania v. Sec. of Labor*, 442 F.2d 159, 173 n. 43 (3d Cir. 1970), cert. denied, 404 U.S. 854, 92 S.Ct. 98, 30 L.Ed.2d 95 (1971).

those limited cases where necessary to cure the ill effects of past discrimination, the courts alone are in a position to afford due process to all concerned in determining the necessity for and in fashioning such relief. Further, the administration of such relief by the courts tends to assure that those remedial programs will be uniform in nature and will exist only as long as necessary to effectuate the purposes of the Civil Rights Act.

Even though the courts may establish affirmative action relief, they have been reluctant to impose quota systems like that in question here, for they recognize that such programs are at best inequitable. In a very recent case, *Kirkland v. New York*, 520 F.2d 420 (2d Cir. 1975), the court made the following observation:

"The most ardent supporters of quotas as a weapon in the fight against discrimination have recognized their undemocratic inequities and conceded that their use should be limited. Commentators merely echo the judiciary in their disapproval of the discrimination inherent in a quota system." *Kirkland, supra* at p. 427.

Thus, the courts are cognizant of the undesirable effects accompanying quota systems, and, accordingly, have established such systems only in factually limited circumstances. For example, the courts in recent decisions have refused the invitation to impose such affirmative action plans without first being convinced that those seeking relief have themselves been the subject of past discrimination. In the case of *Watkins v. United Steel Workers of Am., Local No. 2369*, 516 F.2d 41 (5th Cir. 1975), the Fifth Circuit Court of Appeals held that even though the use of a seniority system to lay off employees may result in the discharge of more blacks than whites, the discharge system was not discriminatory where the individuals who suffered the layoffs were in their "rightful place" [5] since they had never personally experienced prior employment discrimination.

The Court in *Watkins* said, "To hold the seniority plan discriminatory as to the plaintiffs in this case requires a determination that blacks not otherwise personally discriminated against should be treated preferentially over equal whites." *Watkins, supra*, at p. 46.

In another very recent case, *Chance v. Board of Examiners of the Board of Education of the City of New York*, 534 F.2d 993 (2d Cir. 1976), the Court analyzed the imposition of a quota system the effect of which was to require a senior, more experienced white employee to stand aside and forego the seniority benefits guaranteed him by the New York Education Law, solely because a younger, less experienced employee was black. The *Chance* case was a civil rights class action which began in 1970 for the purpose of correcting an underrepresentation of minorities in supervisory positions in the New York City School System. The United States District Court for the Southern District of New York directed the Board of Education of the City of New York to excess supervisory personnel in accordance with a formula imposing racial quotas upon the excessive process. Excessing rules are very similar to the principles of seniority inasmuch as excessing rules provide, in brief, that when a position in a school district is eliminated, the least senior person in the job classification used to fill that position shall be transferred, demoted or terminated. As the Court of Appeals recognized, the inevitable consequences of the racial quotas preventing the excessing of a black or Puerto Rican are that a white person with greater seniority must be excessed in his place. In reversing the District Court's decision, the Second Circuit explained:

"Our brothers in the Third and Seventh Circuits have examined the legislative history of Title VII, and they are in accord that this Act was not intended to invalidate bona fide seniority systems. *Waters*, supra, 502 F.2d at 1318; *Jersey Central*, supra, 508 F.2d at 710. Our

---

**5.** For a full discussion of the "rightful place" theory see *United States v. Local 189, United*

*Papermakers & Paperworkers*, 282 F.Supp. 39 (E.D.La.1968) aff'd 416 F.2d 980 (5th Cir. 1969).

brothers in the Fifth Circuit say that 'regardless of what that history may show as to congressional intent concerning the validity of seniority systems as applied to persons who have themselves suffered from discrimination, there was an express intent to preserve contractual rights of seniority as between whites and persons who had not suffered any effects of discrimination.'" *Chance, supra,* at 997.

The Court further stated that if a minority worker had been kept from his "rightful place" on the seniority lists by the use of discriminatory examinations, or other discriminatory practices, he may in some instances, be entitled to preferential treatment. Reasoning, however, that such preferential treatment should be given not because the man is black, but because he had been discriminated against, the Court observed:

> "The 'freedom now' and 'rightful place' doctrines create constructive or fictional seniority to put minority employees in the approximate spot on the seniority list that they would have occupied had they not been the subject of discrimination. *Local 189, United Papermakers v. United States,* supra, 416 F.2d at 988. The former contemplates the displacement of white workers where necessary; the later involves only the filling of vacancies. We have followed the 'rightful place' doctrine to the extent of using plant seniority, instead of departmental seniority, where departmental discrimination has prevented or delayed the transfer of minority workers. *United States v. Bethlehem Steel Corp.,* 446 F.2d 652 (2d Cir. 1971)." *Chance, supra,* at 999.

■ Since the evidence received during the trial of the case *sub judice* established that the black employees being preferred over more senior white employees had never themselves been the subject of any unlawful discrimination during hiring, they occupied their "rightful place" in the plant. Accordingly, a plant-wide seniority system at Kaiser's Gramercy plant would have adequately ensured that its minority employees were receiving those benefits commensurate with their seniority. Any dual seniority arrangement or quota system based on race could only have resulted in unlawful discrimination against those white employees with greater seniority. Thus, applying the rationale developed in *Watkins* and *Chance* to the facts of this case, the Court must conclude that an affirmative action quota system such as that imposed by Kaiser would have been inappropriate for the Gramercy plant, even if defendants were correct in their contention that employers have some right to discriminate by analogy to those cases where courts have ordered affirmative relief programs.

In reaching its conclusion that the discriminatory provisions of Kaiser's affirmative action program violate specific proscriptions of Title VII of the 1964 Civil Rights Act, this Court is well aware that similar programs have been adopted, before and after enactment of the 1964 Act, by many employers in the private and public sector, often because of pressure from various agencies of the Executive Branch of the United States Government. Undoubtedly, the laudable objective of promoting job opportunities in our society for members of minority groups has been viewed as a justification for the discrimination against other individuals which almost certainly results from such programs. Prior to the effective date of the 1964 Civil Rights Act, employers may have been free, for whatever motivation, to engage in such discriminatory employment practices. Indeed, it well may be that employers should be permitted to discriminate in an otherwise illegal fashion in order to bring about a national social goal. This Court, however, is not sufficiently skilled in the art of sophistry to justify such discrimination by employers in light of the unequivocal prohibitions against racial discrimination against *any individual* contained in Sections 703(a) and (d) of the 1964 Act.

Moreover, if such racial discrimination by employers against individuals is to be sanctioned as a benign exception to the prohibitions of Title VII of the 1964 Civil Rights

Act, then it is the opinion of this Court that such exception should be enacted by the Congress, that branch of our government responsible for creation of the national policy reflected in the prohibitions of Title VII, and not by a life tenured member of the Federal Judiciary. Numerous policy decisions of monumental importance to the nation necessarily would have to be made in creating exceptions to Sections 703(a) and (d) of the 1964 Act, and the type of Congressional scrutiny and public debate such as that reflected in the legislative history of the 1964 Act would ensure that competing interests could be balanced in a fashion consistent with the democratic processes pursuant to which the 1964 Act itself was adopted.

Accordingly, judgment will be entered in favor of plaintiffs, and against defendants, granting a permanent injunction restraining defendants from denying Mr. Weber and the other members of the class access to on-the-job training programs on the basis of race.