Roald E. TANGREN, John V. Fletcher, William F. Cleghorn, George R. Lane, Donald W. Hart, James W. Bonds and Robert W. Whitfield, Plaintiffs,

v.

WACKENHUT SERVICES, INCORPORATED, a corporation, and Independent Guard Association of Nevada, Local No. 1, an unincorporated association and labor organization, Defendants.

Civ. No. LV–2126 RDF.

United States District Court,
D. Nevada.

Oct. 25, 1979.

540

Albright & McGimsey, Las Vegas, Nev., for plaintiffs.

Gibson, Dunn & Crutcher, Wm. F. Spalding, Kenneth W. Anderson, Los Angeles, Cal., Thorndal & Liles, Ltd., John L. Thorndal, Las Vegas, Nev., for defendant Wackenhut.

Lehman Professional Corp., Jack Lehman, Las Vegas, Nev., Ivan J. Potts, Los Angeles, Cal., for defendant Independent Guard Assoc. of Nevada.

## OPINION

ROGER D. FOLEY, Chief Judge.

This is an employment discrimination action brought pursuant to Title VII of the Civil Rights Act of 1964, Title 42, U.S.C., § 2000e et seq. The plaintiffs, now seven white males, representing only themselves, challenge a provision of the collective bargaining agreement entered into August 13, 1972, between their employer, Wackenhut Services, Inc. (WSI) and their union, Independent Guard Association of Nevada (IGAN). The challenged paragraphs of the agreement now provide: [1]

"6.3. The parties agree to the following goals and objectives for the minimum employment of minority male employees and female employees in the bargaining unit:

> July 1, 1978 to July 1, 1979 . . .
> 18% Minorities, 5% Female
>
> July 1, 1979 to July 1, 1980 . . .
> 19% Minorities, 6% Female
>
> July 1, 1980 to July 1, 1981 . . .
> 20% Minorities, 7% Female

"6.4. The provisions of Paragraphs 9.4 and 9.5 shall be suspended to the extent necessary to guarantee that a minority or female employee covered by this Agreement shall not be reduced in force if the goal and objective of 18% minorities and 5% females (6% females effective July 1, 1979; 7% females effective July 1, 1980) is either not achieved at the time of the reduction in force or, if achieved, did not continue to be met in the event a minority or female employee was to be reduced in force. In the event this action becomes necessary, the non-minority male with the least amount of seniority will be laid off first."

The plaintiffs maintain that these paragraphs when considered together constitute unlawful discrimination on the basis of race. The plaintiffs have not raised a sex discrimination claim. The defendants insist that these paragraphs constitute lawful affirmative action instituted to eradicate the effects of past discrimination. The parties are in agreement as to the basic facts and the case is before this Court on cross motions for summary judgment.

## FACTUAL BACKGROUND

The following facts are admitted:

On February 1, 1965, WSI obtained the government contract to provide security services for the Atomic Energy Commission (AEC) [2] at certain locations in Southern Nevada, principally at the Nevada Test Site. On February 1, 1965, WSI took over the operation from the previous contractor,

---

1. During the pendency of this case, the Agreement has been twice renegotiated with the same provision included except that percentage goals have been increased. As originally included in the contract effective July 1, 1972, the applicable percentages were:

> "July 1, 1972 to July 1, 1973 . . .
> 10% minorities, 2% females
>
> July 1, 1973 to July 1, 1974 . . .
> 12% minorities, 3% females
>
> July 1, 1974 to July 1, 1975 . . .
> 14% minorities, 4% females"

The contract effective July 1, 1975, included the following goals in paragraph 6.3:

> "July 1, 1975 to July 1, 1976 . . .
> 14% minorities, 4% females
>
> July 1, 1976 to July 1, 1977 . . .
> 16% minorities, 4% females
>
> July 1, 1977 to July 1, 1978 . . .
> 18% minorities, 4% females"

As originally negotiated, paragraph 6.4 invoked the departure from normal seniority provisions for purposes of layoffs whenever the goals and objectives of paragraph 6.3 had not been achieved or would not be maintained. The original paragraph, and the 1975 version as well, read as follows:

"6.4. In furtherance of the provisions of Paragraph 6.3 above, the provisions of Paragraphs 9.4 and 9.5 shall be suspended to the extent necessary to guarantee that a minority or female employee covered by this Agreement shall not be reduced in force if the goals and objectives set forth in Paragraph 6.3 above, are either not achieved at the time of the reduction in force or, if achieved, did not continue to be met in the event a minority or female employee was to be reduced in force. In the event this action becomes necessary, the non-minority male with the least amount of seniority will be laid off first."

2. The activities of the former AEC, later the Energy Resources Development Administration (ERDA), are now within the Department of Energy (DOE).

Federal Services, Inc. (FSI). No Blacks had been hired by FSI prior to 1962. On February 1, 1965, there were six minority employees in a total work force of 226 guards. While the 1960 census indicated a Black population in Clark County, Nevada,[3] of approximately 9%, these six minority employees represented only 2.7% of FSI's employees. WSI undertook an affirmative action program to hire minority group members and, during the period from February 1965 to January 1972, did in fact hire a significant number of minorities. Of a total of 287 guards hired, 63 or 22% were minority group members. But during the same period, 14.8% (115 of 776) of the guards laid off were minority group members. The 1970 census showed a minority population percentage of 16% and a minority percentage in the work force of 14% in Clark County, Nevada. The parties are agreed that WSI has never discriminated against minorities in its hiring practices since it began performance of its contract with the AEC entered into on February 1, 1965. They also agree that IGAN has not refused membership to anyone because of their race. It is not a condition of employment with WSI that the employee belong to IGAN.

At all times prior to August 13, 1972, collective bargaining agreements provided for layoffs in order of reverse seniority. Seniority for all employees in the bargaining unit was determined as of the date of their commencing work. During the period from 1965 to 1972, reductions in force occurred frequently (averaging seven per year), affecting as many as twenty-five guards at one time. As a result, a large percentage of newly hired minority employees were laid off and therefore the overall percentage of minority workers in WSI's employ did not substantially increase over the period. As of August 13, 1972, there were only eleven minority employees out of a total of 219 guards, or 5%. The retention rate for minority employees during the 1965–1972 period of layoffs was only 16% (11 of 69), while the same rate for nonminorities was 44% (208 of 444).

The AEC reviewed WSI's affirmative action program for the period May 16, 1966, through September 30, 1970, and filed a report, dated April 19, 1971, to the effect that WSI was not in compliance with the affirmative action requirements of Executive Order 11246 and the regulations thereunder applicable to government contractors, because the layoff procedure had a disproportionate impact upon minority employees. WSI then agreed to propose, and to attempt with all diligence to negotiate successfully, a change in the layoff provisions of the collective bargaining agreement that would maintain a minimum percentage of minority employees in case of future reductions in force. On the basis of that commitment, the AEC changed WSI's status to that of "compliance."

In the course of negotiations for a new collective bargaining agreement in 1972, WSI insisted on the inclusion of the affirmative action provision. IGAN resisted the change and when the old contract expired on June 30, 1972, the proposed new layoff provision was one reason for a strike by the employees. IGAN filed an unfair labor practice charge with the National Labor Relations Board concerning WSI's unyielding stance with respect to the layoff issue. The regional director of the NLRB refused to issue a complaint in the matter because WSI's proposal had been discussed with the union and was drafted in response to the affirmative action requirements of the AEC. After a majority of its members reluctantly approved, IGAN entered into a collective bargaining agreement with WSI containing the challenged paragraphs 6.3 and 6.4, and the strike ended.

3. Clark County, Nevada, which includes the greater Las Vegas area, is the only major population center in Southern Nevada. The Nevada Test Site is situated mostly in Nye County and partially in Lincoln County. Both of these Nevada counties north of Clark County have minimal population. The entire Nevada Test Site has little population. During the years discussed in this opinion, virtually all of the Test Site employees, including WSI employees, resided in Clark County and commuted to work at the Test Site.

IGAN's position in this lawsuit is somewhat peculiar. The union filed an answer to the complaint denying any discriminatory conduct toward the plaintiffs; but, in response to plaintiffs' motion for summary judgment, the union refers to its trial brief which states:

". . . in keeping with its duty of fair and impartial representation of all unit employees . . . [IGAN] advances no position regarding the merits of the action and is prepared to modify the Agreement in any particular, if any, which the Court may feel violates Title VII of the Act."

(Trial Brief, p. 2.)

Alleging that the modification of the seniority system was agreed to only because the union "could no longer financially maintain its strike action" (Response to Motion for Summary Judgment, p. 2), IGAN seeks to avoid any liability that might arise out of this action.

### THE REVERSE DISCRIMINATION CLAIM

Sections 703(a) and (c) of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(a) and (c), prohibit an employer and union from discriminating against any individual on account of race or other impermissible characteristics. In pertinent part, these sections provide:

"(a) It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

". . .

"(c) It shall be an unlawful employment practice for a labor organization—

(1) to exclude or to expel from its membership, or otherwise to discriminate against, any individual because of his race, color, religion, sex, or national origin; . . ."

The plaintiffs contend that in adopting paragraphs 6.3 and 6.4 of the collective bargaining agreement, the defendants WSI and IGAN have violated this statute.

■ It is clearly established that Title VII protects all employees from discrimination on the basis of race, whether they be members of a minority or majority group. *McDonald v. Santa Fe Trail Transportation Co.,* 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976). Cf. *Regents of the University of California v. Bakke,* 438 U.S. 265, 291, 98 S.Ct. 2733, 2749, 57 L.Ed.2d 750, 771 (1978).

On June 27, 1979, the Supreme Court decided *United Steelworkers of America, et al. v. Weber, et al.,* —— U.S. ——, 99 S.Ct. 2721, 61 L.Ed.2d 480. The principles laid down in *Weber* control the decision in this case.

The Supreme Court majority set out the facts as follows:

"In 1974 petitioner United Steelworkers of America (USWA) and petitioner Kaiser Aluminum & Chemical Corporation (Kaiser) entered into a master collective-bargaining agreement covering terms and conditions of employment at 15 Kaiser plants. The agreement contained, inter alia, an affirmative action plan designed to eliminate conspicuous racial imbalances in Kaiser's then almost exclusively white craft work forces. Black craft hiring goals were set for each Kaiser plant equal to the percentage of blacks in the respective local labor forces. To enable plants to meet these goals, on-the-job training programs were established to teach unskilled production workers—black and white—the skills necessary to become craft workers. The plan reserved for black employees 50% of the openings in these newly created in-plant training programs.

"This case arose from the operation of the plan at Kaiser's plant in Gramercy, La. Until 1974 Kaiser hired as craft workers for that plant only persons who had had prior craft experience. Because blacks had long been excluded from craft unions,[1] few were able to present such credentials. As a consequence, prior to 1974 only 1.83% (five out of 273) of the skilled craft workers at the Gramercy plant were black, even though the work force in the Gramercy area was approximately 39% black.

"[1] Judicial findings of exclusion from crafts on racial grounds are so numerous as to make such exclusion a proper subject for judicial notice (citing cases)."

"Pursuant to the national agreement Kaiser altered its craft hiring practice in the Gramercy plant. Rather than hiring already trained outsiders, Kaiser established a training program to train its production workers to fill craft openings. Selection of craft trainees was made on the basis of seniority, with the proviso that at least 50% of the new trainees were to be black until the percentage of black skilled craft workers in the Gramercy plant approximated the percentage of blacks in the local labor force. See [*Weber v. Kaiser Aluminum & Chemical Corp.* (D.C.)] 415 F.Supp. 761, 764.

"During 1974, the first year of the operation of the Kaiser-USWA affirmative action plan, 13 craft trainees were selected from Gramercy's production work force. Of these, 7 were black and 6 white. The most junior black selected into the program had less seniority than several white production workers whose bids for admission were rejected. Thereafter one of those white production workers, respondent Brian Weber, instituted this class action in the United States District Court for the Eastern District of Louisiana.

"The complaint alleged that the filling of craft trainee positions at the Gramercy plant pursuant to the affirmative action program had resulted in junior black employees receiving training in preference to more senior white employees, thus discriminating against respondent and other similarly situated white employees in violation of . . . Title VII.

The Supreme Court in *Weber* took judicial notice that throughout the United States Blacks had long been excluded from craft positions on racial grounds. Thus, Kaiser's prior hiring practices served to perpetuate the effects of past discrimination. Justice Brennan's majority opinion emphasized the "fact that the Kaiser-USWA plan is an affirmative action plan voluntarily adopted by private parties to eliminate traditional patterns of racial segregation." —— U.S. at ——–——, 99 S.Ct. at 2726, 61 L.Ed.2d at 487–488. The Court held that Title VII "does not condemn all private, voluntary, race-conscious affirmative action plans." Id., —— U.S. at ——, 99 S.Ct. at 2730, 61 L.Ed.2d at 492.

Elaborating on the factors which led the Court to uphold the Kaiser plan, Justice Brennan wrote:

"We need not today define in detail the line of demarcation between permissible and impermissible affirmative action plans. It suffices to hold that the challenged Kaiser-USWA affirmative action plan falls on the permissible side of the line. The purposes of the plan mirror those of the statute. Both were designed to break down old patterns of racial segregation and hierarchy. Both were structured to 'open employment opportunities for Negroes in occupations which have been traditionally closed to them.' 110 Cong.Rec. 6548 (remarks of Sen. Humphrey).

"At the same time the plan does not unnecessarily trammel the interests of the white employees. The plan does not require the discharge of white workers and their replacement with new black hires. Cf. *McDonald v. Santa Fe Trail Trans. Co.,* supra. Nor does the plan create an absolute bar to the advancement of white employees; half of those trained in the program will be white. Moreover, the plan is a temporary measure; it is not intended to maintain racial balance, but simply to eliminate a mani-

fest racial imbalance. Preferential selection of craft trainees at the Gramercy plant will end as soon as the percentage of black skilled craft workers in the Gramercy plant approximates the percentage of blacks in the local labor force.

"We conclude, therefore, that the adoption of the Kaiser-USWA plan for the Gramercy plant falls within the area of discretion left by Title VII to the private sector voluntarily to adopt affirmative action plans designed to eliminate conspicuous racial imbalance in traditionally segregated job categories."

Id., —— U.S. at ——, 99 S.Ct. at 2730, 61 L.Ed.2d at 492 (footnotes omitted).

Thus, the duty of this Court is to determine whether the challenged paragraphs 6.3 and 6.4, herein described as seniority override, "mirrors the purposes" of Title VII and "does not unnecessarily trammel the interests of the white employees."

### A. *Voluntary Affirmative Action*

The affirmative action plan adopted by WSI and IGAN is "voluntary" within the meaning of that term as it is used in the *Weber* decision. Much like WSI in the instant case, Kaiser had received some "critical reviews" from the Office of Federal Contract Compliance and was under pressure to adopt an affirmative action program. See —— U.S. at ——, 99 S.Ct. at 2731, 61 L.Ed.2d at 493 (Blackmun, J., concurring). Indeed, the pressure on Kaiser may have been even greater than that exerted on WSI. Judge Wisdom pointed out in his dissent from the Fifth Circuit decision in *Weber* that there was a nationwide enforcement effort directed not only at Kaiser's plants, but at the other two major members of the American aluminum industry: Reynolds Metals and Alcoa. The same types of provisions were also included as part of the national steel producers settlement. See *Weber v. Kaiser Aluminum & Chemical Corp.*, 563 F.2d 216, 228-29 (5th Cir. 1977) (Wisdom, J., dissenting).

The fact that IGAN did not readily assent to the affirmative action provision proposed by WSI, even to the point of striking and of filing an unfair labor practice complaint with the NLRB, does not distinguish this case. Such difficulties and disagreements are an integral part of the collective bargaining process. When one side or the other finally concedes one point in return for some other benefit, including a resumption of work, the contract is no less "voluntary." To find otherwise would severely impair the entire system for resolving labor-management disputes.

This Court agrees with the emphasis placed upon the need for flexibility in allowing private parties to develop voluntary affirmative action programs. Criticizing the practical effect of the Fifth Circuit's majority decision against the Kaiser-USWA plan, Judge Wisdom wrote in dissent:

"The employer and the union are made to walk a high tightrope without a net beneath them. On one side lies the possibility of liability to minorities in private actions, federal pattern and practice suits, and sanctions under Executive Order 11246. On the other side is the threat of private suits by white employees and, potentially, federal action."

(563 F.2d at 230.)

Justice Brennan's opinion in *Weber* also pointed out the desirability of encouraging private self-imposed remedies to patterns of past racial exclusion and pointed to the Congressional desire to " 'create an atmosphere conducive to voluntary or local resolution of other forms of discrimination.' " —— U.S. at ——, 99 S.Ct. at 2728, 61 L.Ed.2d at 489 (quoting H.R.Rep.No.914, 88th Cong., 1st Sess. (1963), at 18) (Court's emphasis omitted).

" . . . [W]e cannot agree with respondent that Congress intended to prohibit the private sector from taking effective steps to accomplish the goal that Congress designed Title VII to achieve. The very statutory words intended as a spur or catalyst to cause 'employers and unions to self-examine and to self-evaluate their employment practices and to endeavor to eliminate, so far as possible, the last vestiges of an unfortunate and ignominious page in this country's history,' *Albemarle v. Moody,* 422 U.S. 405,

418, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975), cannot be interpreted as an absolute prohibition against all private, voluntary, race-conscious affirmative action efforts to hasten the elimination of such vestiges. It would be ironic indeed if a law triggered by a Nation's concern over centuries of racial injustice and intended to improve the lot of those who had 'been excluded from the American dream for so long.' 110 Cong.Rec., at 6552 (remarks of Sen. Humphrey), constituted the first legislative prohibition of all voluntary, private, race-conscious efforts to abolish traditional patterns of racial segregation and hierarchy."

(Id., —— U.S. at —— and ——, 99 S.Ct. at 2728 and ——, 61 L.Ed.2d at 489 and 490. Footnote omitted.)

### B. *The Weber Standard*

#### 1. *The purposes of Title VII*

Applying the first element of the standard laid down by the Supreme Court decision in *Weber,* the WSI–IGAN affirmative action plan embodied in the seniority override in favor of minority employees "mirrors the purposes of the statute." It was adopted in order to break down a hierarchy that perpetuated the effects of past racial discrimination, here the absence of, or only a minimal minority participation in, the WSI work force. Although the district court in *Weber* (415 F.Supp. 761) found that there had been no actual racial discrimination on Kaiser's part, Judge Wisdom pointed out that there were grounds upon which such a finding could have been made. See 563 F.2d at 231–232. The Supreme Court avoided this problem by adopting a theory that permitted voluntary affirmative action that served to "eliminate conspicuous racial imbalance in traditionally segregated job categories," —— U.S. at ——, 99 S.Ct. at 2730, 61 L.Ed.2d at 492, judicially noticing that, nationally, craft unions were such categories. —— U.S. at ——, —— n.1, 99 S.Ct. at 2724, 2725 n.1, 61 L.Ed.2d at 485, 486 n.1. While this Court does not have evidence before it indicating that minorities have been excluded nationally or even regionally from positions as security guards, the facts before this Court do indicate that minorities were traditionally excluded from guard positions under contract with the Nevada Operations Office of the AEC and its successor federal agencies,[4] and that is enough. Thus, the seniority provisions of the pre-1972 collective bargaining contracts perpetuated a pattern of the past racial discrimination, i. e., the absence of, or only a minimal minority participation in, the WSI work force.

In this case, as in *Weber,* the employer and the union exercised their discretion to adopt affirmative action programs to eliminate the vestiges of past racial discrimination within a particular employer's work force at a particular plant or operation. This Court deals only with WSI's work force and, in *Weber,* the Court dealt only with the Gramercy, Louisiana, plant, although the Supreme Court did discuss Kaiser's nationwide race-conscious affirmative action program aimed at the elimination of societal or historic racial discrimination, that is, the absence of, or minimal minority participation in, Kaiser's nationwide work force.

Here there is statistical evidence that the number of minorities in the work force of both FSI and WSI was substantially below the percentage of minorities in the local population and work force. The undisputed facts of this case indicate that no Blacks were hired prior to 1962 and that at the time WSI took over the operations at the Nevada Test Site only six minority guards

---

**4.** Furthermore, discrimination against minorities in employment in Southern Nevada and at the Nevada Test Site has previously come before this Court. In the record of *United States v. Local 357, International Brotherhood of Electrical Workers,* 356 F.Supp. 104 (D.Nev.1972), there is evidence that employer and union discrimination against minorities was widespread throughout Southern Nevada, including government contractors at the Nevada Test Site. Indeed, such discrimination was so pervasive that the Nevada Test Site operations were characterized as "lily-white" and remained so until governmental pressure was applied to encourage employment of minorities. Cf. *U. S. v. Nevada Resort Association, et al.,* Civil LV–1645 (consent decree, filed June 4, 1971).

were employed in a staff of 226. This constitutes a minority representation of only 2.7%. This must be contrasted with the 1960 census figures that indicate that the percentage of Blacks, let alone other minority groups, was approximately 9% of the population in the greater Las Vegas area, from which most of the guards are employed. In 1972, there were only eleven minority guards of a total of 219, or 5%, which compares unfavorably with the 1970 census figures showing a 16% minority population and 14% minorities in the labor force of Southern Nevada.

■ Courts have consistently held that statistical evidence is sufficient to establish a prima facie case of unlawful discrimination. See, e. g., *Gibson v. Local 40, Supercargoes & Checkers of the ILWU*, 543 F.2d 1259, 1266 (9th Cir. 1976); *Kaplan v. International Alliance of Theatrical and Stage Employees and Motion Picture Operators*, 525 F.2d 1354 (9th Cir. 1975); *United States v. Ironworkers Local 86*, 443 F.2d 544 (9th Cir.), cert. denied, 404 U.S. 984, 92 S.Ct. 447, 30 L.Ed.2d 367 (1971).[5] If such a showing is sufficient to permit the imposition of legal sanctions, a fortiori, the same showing should permit an employer and union to adopt a voluntary affirmative action program such as the one WSI and IGAN have agreed to. To hold otherwise would leave employers and unions on the tightrope described by Judge Wisdom.

Also, despite the good faith efforts of WSI to hire minority employees after taking over the FSI operations, these recruitment and placement programs were essentially nullified when layoffs followed the "last hired, first fired" seniority system. During the period from February 1965 to January 1972, 14.8% (115 of 776) of those laid off were minority employees. Thus, despite hiring minorities at a rate of 22% (63 of 287 new hires), the number of minority employees increased from six at the time WSI took over to only eleven at the time of the AEC compliance review. It is clear that the seniority system was responsible for the high turnover of minority personnel during this period.

■ Finally, WSI had an obligation to work toward a minority representation among its employees that approximated the minority percentage in the local labor force. This is the clear import of Executive Order 11246 and the regulations thereunder applicable to government contractors. 41 CFR § 60–1.1 et seq. The only effective means of complying was for WSI to effect a change in the seniority system. Therefore, the WSI–IGAN plan, like the plan upheld in *Weber*, "is not intended to maintain racial balance, but simply to eliminate a manifest racial imbalance." —— U.S. at ——, 99 S.Ct. at 2730, 61 L.Ed.2d at 492.

## 2. *The Interests of Nonminority Employees*

Next this Court must consider whether the seniority override adopted by WSI and

---

5. The effect of a prima facie case of discrimination based on a statistical showing is to place the burden of persuasion on the defendant to rebut the inference of discrimination. Although the burden of proof does not shift, because of the nature of this discrimination claim, it is in fact the plaintiffs who have attempted to show the lack of past discrimination. The plaintiffs have attempted to rebut the statistical showing with the affidavit of Merle McIntire, who at one time was project manager of the FSI Nevada operations. Most of his affidavit is in the form of conclusory denials of discrimination on the part of FSI. Such statements are insufficient to raise a genuine issue of material fact. See *Piantadosi v. Loew's, Inc.*, 137 F.2d 534, 536 (9th Cir. 1943). That portion of Mr. McIntire's affidavit that purports to relate the results of government reviews of FSI's operations is inadmissible hearsay.

Even if this statement were determined to be admissible and sufficient to raise a genuine issue of material fact, this Court is convinced that the issue would not be material to the resolution of this case. Therefore, summary disposition would still be appropriate. *Weber* does away with any requirement that there has been actual, demonstrable racial discrimination before a voluntary affirmative action program may be implemented. *Weber* simply requires that the plan be reasonably calculated to break down a pattern of past societal racial discrimination to open employment opportunities traditionally closed to minorities. The statistical evidence clearly indicates that the WSI–IGAN seniority override was intended to eliminate the effects of a long-standing situation in which Blacks were not hired at all or in a number comparable to the minority representation in the local labor force.

IGAN "unnecessarily trammels the interests of the white employees." The *Weber* Court's reading of Title VII is persuasive that it does not. It is here, however, that this decision represents an extension of the *Weber* rationale, because here the issue of pre-existing seniority rights is squarely before this Court.[6] Thus, this Court must address the plaintiffs' contention that Congress has protected seniority expectations of nonminority employees from alteration in connection with affirmative action plans.

The plaintiffs rely on § 703(h) of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(h):

> "Notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority or merit system, . . . provided that such differences are not the result of an intention to·discriminate because of race, color, religion, sex, or national origin . . . "

The plaintiffs maintain that this subsection, as interpreted in *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), precludes the implementation of the affirmative action seniority override where there has been no showing of discrimination subsequent to the effective date of the Civil Rights Act, that is, July 2, 1965.

██ *Teamsters* was a government suit against the union and employer challenging a departmental seniority system. The Supreme Court held that § 703(h) immunized "bona fide seniority systems"[7] from governmental attack as unlawfully discriminatory. The statute does not say, nor did the Supreme Court hold in *Teamsters*, that it shall be unlawful to alter voluntarily a seniority system that, while "bona fide" for purposes of § 703(h), perpetuates past discriminatory employment practices. Indeed, the *Teamsters* majority specifically noted that "Were it not for § 703(h), the seniority system in this case would seem to fall under the *Griggs* rationale" that Title VII outlaws all practices, even those neutral on their face, that " 'operate to "freeze" the status quo of prior discriminatory practices.' " 431 U.S. at 349, 97 S.Ct. at 1861 (quoting *Griggs v. Duke Power Co.*, 401 U.S. 424, 430, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971)). As a special exception to the general policy outlined in *Griggs*, the impact of § 703(h) should be limited to the express language of the statute. It should not be read so as to preclude the implementation of a program that goes beyond the requirements of Title VII. (—— U.S. ——, 99 S.Ct. 2733, 61 L.Ed.2d 496, Blackmun, J., concurring.) This is not unlike the distinction recognized by the majority in *Weber* with respect to § 703(j) that limits what employers and unions may be *required* to implement in the way of preferential treatment for minorities. Justice Brennan pointed out that this restriction was inapplicable to the voluntarily adopted plan at Kaiser Aluminum be-

---

6. In *Weber*, Justice Blackmun specifically noted that seniority rights were not an issue before the Court because the Kaiser-USWA training program was entirely new and therefore not subject to the seniority system applicable to previously existing conditions of employment. —— U.S. at ——, 99 S.Ct. at 2733, 61 L.Ed.2d at 496. See also 563 F.2d at 233–34 (Wisdom, J., dissenting.).

It should also be noted here that there was no outright modification of seniority rights. The action taken in this case is correctly termed a seniority override because in all respects, except for the determination of layoffs, the seniority system as it existed prior to 1972 remains intact. Even in the determination of layoffs, after the application of the minority preference, the determination of which nonminority employee will be terminated is based on the pre-existing seniority hierarchy.

7. There can be no argument in this case that the seniority system in effect before June 30, 1972, was not "bona fide." Indeed, WSI concedes that it was. The seniority system was based entirely upon length of employment. There was no prior segregation of job categories in which minorities were relegated to inferior positions. Cf. *Franks v. Bowman Transportation Co.*, 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976). Moreover, there is no evidence that there are identifiable individuals who are not in their "rightful place" in the seniority system. Cf. *United States v. Navajo Freight Lines*, 525 F.2d 1318, 1325–26 (9th Cir. 1975).

cause the statute said nothing about what employers are *permitted* to do. ——— U.S. at ———, 99 S.Ct. at 2728, 61 L.Ed.2d at 490. Similarly, the statutory declaration that the application of an otherwise bona fide seniority system shall not be unlawful does not lead to the conclusion that a voluntary modification of the same system is unlawful.

■ This conclusion is reinforced by an examination of the nature of "seniority rights." Courts have long recognized that seniority rights are not vested. They are subject to alteration at the adoption of each collective bargaining agreement.

In another case, Justice Brennan, speaking for the majority, stated:

"The Court has also held that a collective-bargaining agreement may go further, enhancing the seniority status of certain employees for purposes of furthering public policy interests beyond what is required by statute, even though this will to some extent be detrimental to the expectations acquired by other employees under the previous seniority agreement. *Ford Motor Co. v. Huffman*, 345 U.S. 330 [73 S.Ct. 681, 97 L.Ed. 1048] (1953). And the ability of the union and employer voluntarily to modify the seniority system to the end of ameliorating the effects of past racial discrimination, a national policy objective of the 'highest priority,' is certainly no less than in other areas of public policy interests."

*Franks v. Bowman Transportation Co.*, 424 U.S. 747 at 778, 779, 96 S.Ct. at 1271.

In addition, the seniority override "does not require the discharge of white employees and their replacement with new black hires." *Weber*, supra, ——— U.S. at ———, 99 S.Ct. at 2730, 61 L.Ed.2d at 492. Rather, when a reduction in force is necessary it simply requires that, in choosing who will be laid off, the least senior nonminority employees go before those minority employees hired to accomplish the goal of eliminating the underutilization of available minorities in the labor force. Moreover, the program is temporary. It is subject to renegotiation every three years. We must assume that WSI and IGAN will eliminate the preference in favor of minorities when it no longer becomes necessary to artificially insure that minorities are adequately represented in WSI's work force.[8]

■ Finally, we should note that plaintiffs mistakenly rely on those cases that suggest that relief is unavailable under Title VII from discrimination that occurred prior to the effective date of the Civil Rights Act. See, e. g., *Teamsters*, supra. Here again the limitation on the extent of relief available applies only to judicially imposed relief. This limitation was intended to shield employers from claims under Title VII for actions taken before the en-

8. This Court would be very reluctant to approve a minority preference that went beyond the percentage of minority representation in the local labor force. It seems that the permissibility of voluntary affirmative action has such an implicit limitation since the whole concept is grounded on the fact that minority groups have been underutilized in the labor force. As Justice Brennan stated in *Weber*, ——— U.S. at ———, 99 S.Ct. at 2730, 61 L.Ed.2d at 492:

"Preferential selection of craft trainees at the Gramercy plant will end as soon as the percentage of black skilled craft workers in the Gramercy plant approximates the percentage of blacks in the local labor force."

It appears that the limits of affirmative action in this respect are being approached in the WSI–IGAN situation. The 1979–1980 percentage in paragraph 6:3 of the Agreement is 19% representation for minorities. We are unable to evaluate the extent to which this reflects an attempt to approximate the minority representation in the population or labor force. The Nevada Employment Security Department is the agency responsible for making statistical studies as to the demographic makeup of the local work force to aid in the development of affirmative action plans. In checking the reports of that office, this Court has learned that no adjustment is made to the 1970 census figures for possible increases or decreases in the proportion of racial or ethnic groups in the population. Thus, the Nevada Employment Security Department continues to use 16% as the minority representation in the total population and 14% as the minority proportion of the labor force. Nevada Employment Security Department, *Nevada Affirmative Action: State and Counties*, pp. 1, 11, 12 (1979). The results of the 1980 census will permit WSI and IGAN to evaluate the propriety of further extensions of the affirmative action layoff exemption.

actment of the statute, thus preventing the Act from having ex post facto application. It would be ironic, indeed, if the Civil Rights Act were interpreted to preclude voluntary efforts to remedy discrimination to a degree greater than the remedy required by the statute. The Court was careful to point out in *Weber* that the issue of what is permissible voluntary action is distinct from "what Title VII requires or . . . what a court might order to remedy a past proven violation of the Act." —— U.S. at ——, 99 S.Ct. at 2726, 61 L.Ed.2d at 487.

In light of the foregoing, we are convinced that the interests of the nonminority employees are not "unnecessarily trammeled" by the seniority override in favor of minority employees. The relatively minor infringement upon the seniority expectations of white employees is outweighed by the benefits to be achieved by the affirmative action to insure minority representation in WSI's work force. Voluntary efforts to eliminate vestiges of past discrimination should be encouraged. Courts should intervene only when the means adopted for the accomplishment of that goal are unreasonable. This is not such a case. Therefore, summary judgment will be entered in favor of the defendants.

Each party will bear its own costs and attorneys fees.

Defendants' counsel will prepare, serve on plaintiffs' counsel, and submit to this Court a proposed summary judgment within 15 days from the date of this opinion.