770 F.2d 752
 36 Fair Empl.Prac.Cas. 725,
41 Fair Empl.Prac.Cas. 481,
41 Empl. Prac. Dec. P 36,478
Paul E. JOHNSON, Plaintiff-Appellee,
v.
TRANSPORTATION AGENCY, SANTA CLARA COUNTY, CALIFORNIA,
Defendant-Appellant,
and
Service Employees International Union Local 715, Intervenor-Appellant.
 No. 83-1532.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Feb. 14, 1984.
Decided Dec. 4, 1984.
As Amended Sept. 5, 1985.
 
 James L. Dawson, Gruber, Dawson & Preefer, San Jose, Cal., for plaintiff-appellee.
 Steven Woodside, Deputy County Counsel, San Jose, Cal., for defendant-appellant.
 David A. Rosenfeld, Van Bourg, Weinberg, Roger & Rosenfeld, San Francisco, Cal., for intervenor-appellant.
 Appeal from the United States District Court for the Northern District of California.
 Before WALLACE, FLETCHER, and FERGUSON, Circuit Judges.
 FLETCHER, Circuit Judge:
 
 
 1
 Plaintiff alleges that he was denied promotion on account of his sex, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. Sec. 2000e et seq. The district court rejected defendant's contention that it acted lawfully pursuant to a bona fide affirmative action plan. The district court granted retroactive promotion and pay and enjoined defendant from further discrimination against plaintiff.
 
 
 2
 We conclude that the district court misapprehended the requirements for a bona fide affirmative action plan. Guided by United Steelworkers of America, AFL-CIO-CLC v. Weber, 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979), we hold that defendant's affirmative action plan was valid and that defendant acted lawfully pursuant to the plan. We reverse.
 
 
 3
 * Defendant is the Santa Clara County Transportation Agency (Agency). Established and maintained by the County of Santa Clara, California, the Agency is an employer within the meaning of Title VII, 42 U.S.C. Sec. 2000e(b).
 
 
 4
 Plaintiff Paul E. Johnson has been employed by the Agency since 1967. For eleven years, he worked as a road yard clerk. In 1979, when Johnson was a road maintenance worker, the Agency announced an opening for a road dispatcher. A dispatcher allocates crews, equipment, and materials among the various road maintenance jobs in Santa Clara County. Johnson had experience as a temporary road dispatcher for the Agency, as well as with a private company before his employment by the county.
 
 
 5
 Johnson and eight others applied for the dispatcher position. Seven applicants achieved the required 70 or above on an examination given by a two-member oral board. Johnson tied for second with a score of 75. Diane D. Joyce, the only female applicant, placed fourth on the examination with the third highest score of 72.5, rounded to 73. Like Johnson, Joyce was a long-time Agency employee with considerable experience as a road yard clerk, a road maintenance worker, and a part-time road dispatcher.
 
 
 6
 Employees of the Agency's Road Operations Division conducted a second, departmental oral board for the seven applicants who successfully completed the first board. The examiners unanimously recommended Johnson for the dispatcher position. Meanwhile, Joyce informed the County Women's Coordinator that she was ranked fourth on the dispatcher eligibility list. The Women's Coordinator informed the Agency's Affirmative Action Coordinator that Joyce had applied. The Affirmative Action Coordinator recommended to the Agency Director that Joyce be appointed. The Director appointed Joyce to the position of road dispatcher.
 
 
 7
 The Director promoted Joyce under the Agency's voluntary, non-collectively bargained, affirmative action plan dated December 18, 1978 (plan). The plan did not set quotas in any job classification. Rather, the plan established a long-range goal to attain a work force whose composition in all major job classifications approximated the distribution of women, minorities, and handicapped persons in the County labor market. The plan specified no past discriminatory Agency practices; it simply stated that women had been traditionally underrepresented in the relevant job classifications and recognized an extreme difficulty in increasing "significantly the representation of women in certain of those technical and skilled-craft jobs." In 1978, both of the road dispatchers were men. In fact, not one of the Agency's 238 skilled craft positions was held by a woman.
 
 
 8
 Johnson complained to the EEOC. He received a right-to-sue letter from the EEOC in March 1981 and sued the Agency. Johnson challenged the Agency's failure to promote him to the position of road dispatcher, in favor of a less qualified woman, solely as a violation of Title VII.[1]
 
 
 9
 Neither party denied that the examination process was fair and in accord with Merit System Rules derived from the county charter. Based upon the examination results and the departmental interview, the district court found that Johnson was better qualified for the dispatcher position than Joyce. The court found further that, but for his sex, Johnson would have been promoted to the road dispatcher position, and, but for her sex, Joyce would not have been so promoted. The court concluded that the Agency's refusal to promote Johnson violated Title VII.
 
 
 10
 The district court rejected the Agency's defense that its actions were justified by its adherence to the Agency affirmative action plan. The court held that the Agency had failed to meet its burden of producing evidence that adherence to the plan was justified under United Steelworkers of America, AFL-CIO-CLC v. Weber, 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979). Specifically, the court held that the Agency failed to show that its plan was temporary and remedial rather than permanent and designed to maintain a particular balance. As a result, the court concluded, the Agency's actions unnecessarily trammeled Johnson's interests and had the effect of creating an absolute bar to his promotion to the road dispatcher position. While the district court stressed that its decision was based upon the Agency's failure to satisfy the requirement that the plan be temporary, the court also expressed considerable doubt that the plan was appropriately designed to break down entrenched patterns of discrimination.[2]
 
 
 11
 The district court ordered retroactive promotion of Johnson, awarded him back pay based on the promotion, and enjoined the Agency from further discrimination against him. The Agency appeals from the judgment of unlawful discrimination. We have jurisdiction under 28 U.S.C. Sec. 1291.
 
 II
 
 12
 In United Steelworkers of America, AFL-CIO-CLC v. Weber, 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979), the Supreme Court held that Title VII does not forbid private employers and unions from agreeing to the voluntary adoption of a bona fide affirmative action plan aimed at eliminating racial imbalance in traditionally segregated job categories. The Court observed that the prohibition against racial discrimination in Title VII must be examined in light of the legislative history of the Act and the historical context from which it arose. Id. 443 U.S. at 201, 99 S.Ct. at 2726. The primary goal of Title VII was the integration of blacks into the economic mainstream of American society. Id. at 202, 99 S.Ct. at 2726. Not only was the statute itself intended to be remedial, but Congress also hoped that Title VII would "create an atmosphere conducive to voluntary or local resolution of other forms of discrimination." H.R.Rep. No. 914, 88th Cong., 1st Sess., pt. 1, p. 18 (1963), cited in Weber, 443 U.S. at 204, 99 S.Ct. at 2727. The Court concluded that
 
 
 13
 [i]t would be ironic indeed if a law triggered by a Nation's concern over centuries of racial injustice and intended to improve the lot of those who had "been excluded from the American dream for so long," ... constituted the first legislative prohibition of all voluntary, private, race-conscious efforts to abolish traditional patterns of racial segregation and hierarchy.
 
 
 14
 Id. (citation omitted).
 
 
 15
 Although Weber enthusiastically endorsed private-sector affirmative action, the Supreme Court recognized the need for limitations. As the Eighth Circuit has said, courts must "ensure that new forms of invidious discrimination are not approved in the guise of remedial affirmative action." Setser v. Novack Investment Co., 657 F.2d 962, 968 (8th Cir.) (en banc), cert. denied, 454 U.S. 1064, 102 S.Ct. 615, 70 L.Ed.2d 601 (1981). The Court has yet to "define in detail the line of demarcation between permissible and impermissible affirmative action plans," but the Court noted several aspects of the Weber plan that placed it "on the permissible side of the line." Weber, 443 U.S. at 208, 99 S.Ct. at 2730. The plan (1) was designed to break down old patterns of racial segregation and hierarchy, (2) did not unnecessarily trammel the interests of white employees, (3) did not create an absolute bar to the advancement of white employees, and (4) was a temporary measure, "not intended to maintain racial balance, but simply to eliminate a manifest racial imbalance." Id.
 
 
 16
 In La Riviere v. EEOC, 682 F.2d 1275 (9th Cir.1982), we applied Weber to an affirmative action program implemented by a public employer to remedy long-standing male-female imbalance in the work force. We determined that the plan to hire and train women as California Highway Patrol traffic officers satisfied the Weber guidelines. Id. at 1280. Thus, the plan could "be utilized consistently with Title VII without giving rise to liability to applicants who are excluded from the program solely because they belong to the opposite sex." Id.
 
 
 17
 A careful examination of the record in this case and of the opinion below persuades us that the district court adopted an overly restrictive view of Weber. We conclude that the Agency affirmative action plan contains the same characteristics that the Supreme Court relied upon in upholding the Weber plan. The Court observed that "[t]he purposes of the [Weber ] plan mirror those of the statute." 443 U.S. at 208, 99 S.Ct. at 2730. We conclude that the purposes of the Agency plan also mirror those of Title VII.
 
 
 18
 Because the district court based its decision on its perception that the plan was not a temporary measure, we begin there. The district court found that "[t]he Affirmative Action Plan had no end date or other provision which would have the effect of ending preferential treatment to women." The court cited the 1978 Agency plan, the 1979 county plan, and the testimony of James Graebner, the Agency Director.
 
 
 19
 The duration of the plan, however, while subject to factfinding by the district court, is only one factor in determining that a plan "is not intended to maintain ... [sexual] imbalance." Weber, 443 U.S. at 208, 99 S.Ct. at 2730. Permanent maintenance is simply one potentially impermissible factor to be used in determining the validity of an affirmative action program; elimination or attainment is one permissible factor.
 
 
 20
 The Agency plan clearly aims at attainment. The district court correctly found that the plan contains no date certain or other express statement of fixed duration. The plan, however, also contains no statement that it is intended to be permanent. Enforcing it to change the male-female ratio in the skilled trades from 238 to zero, to 237 to one, clearly falls on the attainment side of the line. Moreover, the entire focus of the plan is on "attaining," rather than maintaining, balance. The Agency plan, like the county plan, repeatedly speaks of "attainment." Part IV states: "The Agency long-range goal is to attain a work force whose composition in all job levels and major job classifications approximates the distribution of women, minority and handicapped persons in the Santa Clara County work force." The plan sets forth percentage long-range goals for the "attainment of equitable representation." Unlike the district court, we believe that this emphasis upon the "attainment" of a representative work force does "have the effect of ending preferential treatment to women" once parity is achieved.
 
 
 21
 The district court was persuaded, in part, by Graebner's testimony that affirmative action "is a permanent part of the agency's basic operating philosophy" and even to the effect that the Agency plan will never end. Graebner's testimony must be considered in conjunction with the plan itself, however, with its emphasis on "attainment." Read in context, Graebner's testimony is no more than an expression of the Agency's long-range commitment to affirmative action, and certainly not the expression of an Agency policy to continue the program beyond the point that the law allows. Graebner's own preface, printed at the front of the Agency plan, speaks repeatedly of "attainment" of a representative work force and of the plan's objective "to correct ... deficiencies."
 
 
 22
 Plans like this one are usually voluntarily adopted by employers who wish to express and act upon their commitment to social justice. They should not be rigidly interpreted so as to make their validity depend on technicalities in drafting. To do so would only discourage their adoption and encourage litigation. The district court's assumption that Weber requires an expressed date certain for termination or some other express provision that would trigger the end of an affirmative action plan was erroneous. The Weber Court did not establish a rigid formula for testing the validity of an affirmative action plan. The Court simply noted that one saving aspect of the Weber plan was its temporary nature. Undoubtedly, a plan must end when its remedial function has been served. The fact that the plan must end, however, does not necessitate the inclusion of an explicit ending provision. We read Weber to require that a plan be temporary in the sense that it must end when its goals of parity are met. In that regard, we note a fundamental difference between the Agency plan and the Weber-La Riviere type of plan. In Weber, a fixed percentage (50%) of openings in an in-plant craft-training program was reserved for black employees, in order to hasten achievement of the long-term percentage goal (39%) for black representation in the job category. Similarly, in La Riviere a fixed percentage (50%) of the openings in a pilot study, designed to determine the feasibility of employing female traffic officers, was reserved for women. In both cases, the requirement that a fixed percentage of openings be filled by minorities necessitated a reasonably explicit deadline.[3] By contrast, although the goal of the Agency plan here is also to achieve parity, the plan does not establish fixed percentages for hiring, training, or promotion. Rather, the plan allows flexibility in working towards the long-range goals, with special emphasis on recruitment, selection, training, and promotion of minorities, women, and the handicapped.
 
 
 23
 We conclude that the Agency plan is sufficiently temporary. To paraphrase Weber, the plan is not intended to maintain male-female balance, but simply to eliminate a manifest male-female imbalance. Implicit in the plan is the intent to stop taking sex into account once the long-range percentage goals are attained. Nothing in the plan indicates a contrary intent. Nor is there evidence that parity had already been achieved when Joyce was appointed and that the plan was being used improperly to maintain balance in numbers of each sex. Quite the opposite is true. When Joyce was promoted to road dispatcher, the Agency's 237 other skilled craft positions were all held by men.
 
 
 24
 Like the Weber plan, the Agency affirmative action plan is a remedial effort intended to break down entrenched patterns of discrimination. The Agency plan contains extensive statistics illustrating the underrepresentation of women, minorities, and the handicapped in various Agency job categories. The plan acknowledges "entrenched patterns in hiring and promotion" and recognizes the particular difficulty of achieving parity in upper-level positions when discriminated groups have been traditionally excluded from trainee-level jobs.
 
 
 25
 In order to demonstrate that its plan is remedial, an employer need not show its own history of purposeful discrimination.[4] "[A] judicial determination of ... discrimination is not a prerequisite to an employer adopting voluntary, ... [sex]-conscious remedies to comply with Title VII." Bushey v. New York State Civil Service Commission, 733 F.2d 220, 228 n. 11 (2d Cir.1984), cert. denied, --- U.S. ----, 105 S.Ct. 803, 83 L.Ed.2d 795 (1985) (referring to race-conscious plans). It is sufficient for the employer to show a conspicuous imbalance in its work force. See Setser v. Novack Investment Co., 657 F.2d at 968. This is well illustrated by Weber, in which the employer hired as craftworkers only persons who had previous craft experience. Because blacks had historically been excluded from craft unions, few had previous craft experience and, consequently, few were hired. Weber, 443 U.S. at 198-99, 99 S.Ct. at 2724-25. Although the employer did not engage in purposeful discrimination, only 1.83% of the employer's skilled craft workers were black. Because the local work force was 39% black, the employer was justified in adopting an affirmative action plan.
 
 
 26
 Statistics are extremely useful in showing a conspicuous work force imbalance. We note particularly the difficulty that may confront an employer whose plan is intended to remedy discrimination resulting from societal norms. Some forms of discrimination are so subtle or so accepted that they defy proof other than by statistics. In Weber, the exclusion of blacks from craft unions was so pervasive as to warrant judicial notice. Weber, 443 U.S. at 198 n. 1, 99 S.Ct. at 2725 n. 1.
 
 
 27
 The promotion of Joyce to the road dispatcher position aptly served the Agency plan's remedial purpose. Statistics contained in the plan show that not one of the Agency's 238 skilled craft workers was a woman. Included in the skilled craft category are mechanics, body and fender repairers, construction inspectors, road maintenance workers, and road dispatchers. A plethora of proof is hardly necessary to show that women are generally underrepresented in such positions and that strong social pressures weigh against their participation. The promotion of Joyce was a lawful attempt to remedy the conspicuous imbalance.[5]
 
 
 28
 Weber also warns that a plan must not create an absolute bar to the advancement of other employees or unnecessarily trammel the interests of other employees. 443 U.S. at 208, 99 S.Ct. at 2729. The more closely a plan adheres to its remedial purpose, the less likely it is that the plan will unreasonably infringe upon the interests of other employees. See Setser, 657 F.2d at 968.
 
 
 29
 The affirmative action plan in Weber did not deprive white employees of opportunities for advancement, but created additional opportunities by establishing a new training program for both blacks and whites. Weber, 443 U.S. at 198, 99 S.Ct. at 2724. Thus, although black employees received training in preference to senior white employees, the expansion of opportunities previously limited by seniority prevented undue infringement upon non-minority interests. While the La Riviere plan did not necessarily create new openings, it did admit both male and female applicants. As in Weber, the La Riviere plan reserved 50% of the openings in the program for applicants from the discriminated group.
 
 
 30
 While the Agency plan does not establish specific programs for recruitment, hiring, training, or promotion, it does lay a solid foundation for affirmative action. It assigns tasks and presents timetables for achieving long-range and short-range employment goals. The import of the plan, as with any lawful affirmative action plan, is to give preference to members of underrepresented groups. The plan does not indicate, however, that other employees will be barred or that their interests will be unnecessarily infringed. In fact, as in Weber, the plan contemplates the expansion of opportunity for all. Shortly before the plan was adopted, the county approved 734 new Agency positions to support the expansion of the county bus fleet from 236 to 516 buses. The plan notes that "[a]s the County Transit System continues to expand, additional positions will need to be authorized."
 
 
 31
 Johnson argues that the selection of Joyce as road dispatcher served as a complete bar to his selection for the position. We reject this narrow view. The instant case differs markedly from Weber and La Riviere in that it does not involve the admission of numerous applicants into a training program. Rather, it concerns the selection of one applicant for a single opening. When there is but one opening, the selection of one candidate will necessarily result in exclusion of all others. Unless we are shown a distinct pattern of exclusion of non-minority candidates from such positions, we cannot conclude that a single employment decision serves as a bar or unnecessarily trammels the interests of other employees. The record contains no evidence of such a pattern in this case. Pursuant to the Agency plan, Joyce's sex was viewed as an additional positive factor in an otherwise qualified candidate. The fact that her sex may have been the decisive factor in the selection of a woman for this particular opening does not indicate that men will always be excluded.
 
 
 32
 We conclude that the Agency plan, like the Weber plan, "falls on the permissible side of the line." We hold that the Agency's selection of Joyce, pursuant to the plan, was a lawful effort to remedy an entrenched pattern of manifest imbalance. We are not unsympathetic to the complaint of Johnson and others before our court that employers' attempts to remedy past discrimination sometimes visit burdens upon individual members of the non-minority group. As the Agency plan recognizes, however, "the mere existence of an opportunity for members of [discriminated] groups to apply for jobs ... will not by itself result in timely attainment of parity for currently underrepresented groups." Affirmative action is necessary and lawful, within the guidelines of Weber, to remedy long-standing imbalances in the work force.
 
 
 33
 REVERSED.
 
 
 34
 WALLACE, Circuit Judge, concurring in part and dissenting in part:
 
 
 35
 This "reverse discrimination" case presents some difficult questions arising from the application of an affirmative action plan. I conclude that the record before us is insufficient to make broad pronouncements of judicial policy. I would vacate and remand this case for two reasons. First, the record suggests that the district court improperly allocated the burdens of persuasion and production between the parties. Second, the court did not make sufficiently detailed findings on the plan to hold it invalid.
 
 
 36
 * The facts of this case, referred to in part by the majority, are significant. Johnson, a 58 year-old white male, has lived in Santa Clara for many years. After working 17 years for a cement company, including 7 years as a dispatcher and 8 years as a supervisor, he quit rather than accept a transfer that would uproot his family. Instead, he took a job with the Agency. He worked the better part of 11 years in the position of Road Yard Clerk II, requisitioning road materials for operations, processing purchase orders and arranging material provisions in emergencies. Eventually, however, he concluded that the job offered him little chance for advancement. He requested a voluntary demotion to Road Maintenance Worker II, hoping that the Road Maintenance Division would provide better opportunities for promotion to a position such as road dispatcher.
 
 
 37
 Agency road dispatchers assign crews, equipment, and materials to road maintenance job sites. They must keep accurate records on the status and availability of workers, materials, and equipment at those sites and need a working knowledge of all those things as well as of the various roads maintained by Santa Clara county. Job candidates usually have four years of experience in either dispatch or road work, and can operate a radio telephone. In 1974, Johnson applied to be a road dispatcher but placed second and failed to get the job. The position re-opened in December 1979, by which time Johnson had gained more road work experience, including several months work "out of class" as a road dispatcher. He and eight others applied for the position. Seven of them scored over the required 70 on an examination given by a two-member oral board on April 24, 1980.
 
 
 38
 Johnson placed second, with a score of 75. Employees from the Agency's Roads Division then conducted a second oral board for the seven qualifying applicants, and unanimously recommended Johnson for the job. Neither party denied that both the oral boards and the examination process were fair and in accord with Merit System Rules derived from the County charter. Section 7 of that charter prohibits sex discrimination and ensures promotions based on merit and equal opportunity.
 
 
 39
 Diane Joyce, the woman the Agency ultimately hired instead of Johnson, placed fourth on the examination, scoring 72.5, rounded up to a 73. She had worked as a road maintenance worker for five years and before that a bookkeeper, account clerk, and senior account clerk. She wanted to be a road dispatcher in 1974, but lacked the requisite experience for consideration. During the selection process in 1980, she contacted the County's Women's Coordinator, Lee, and told her about the job opening. Joyce reported that she had placed low on the eligibility list, however. Lee told Morton, the Agency's Affirmative Action coordinator, about Joyce and Morton recommended Joyce's promotion to Graebner, the Director of the Agency. Graebner then promoted Joyce. It was the only time he had ever directly made a promotion decision within the Roads Operation Division. Without Morton's recommendation, one of Graebner's subordinates would have made the road dispatcher appointment.
 
 
 40
 Graebner promoted Joyce under a voluntary, noncollectively bargained affirmative action plan dated December 18, 1978 (plan). The plan set no "quotas," per se, in any job classification, but rather had long-range percentage goals aiming at some numerical parity with women available in the local labor market. It specified no past discriminatory Agency practices, identified no history of purposeful exclusion it sought to remedy, and did not follow Equal Employment Opportunity Commission (EEOC) guidelines, see 29 C.F.R. Sec. 1608.1-.12 (1984). It simply stated that the relevant job classifications had traditionally underrepresented women, and recognized an extreme difficulty in increasing "significantly the representation of women in certain of those technical and skilled-craft jobs." When Graebner promoted Joyce under the plan, he did not carefully inspect the applications and related examination records of Joyce and Johnson, as the County's Merit System Rules authorized him to do. He thought he simply retained discretion to pick from among the top candidates who had crossed a certain threshold of ability.
 
 II
 
 41
 In Title VII cases, "the ultimate question" is "discrimination vel non." United States Postal Service Board of Governors v. Aikens, 460 U.S. 711, 714, 103 S.Ct. 1478, 1481, 75 L.Ed.2d 403 (1983) (Aikens ). The existence of an affirmative action plan does not change this essential inquiry.
 
 
 42
 Title VII plaintiffs may challenge promotion decisions under either disparate treatment or disparate impact theories. Johnson asserts only a disparate treatment claim of the classic Title VII kind: the Agency intentionally and unjustifiably treated him differently only on the basis of his sex. "The 'factual inquiry' in a Title VII case is '[whether] the defendant intentionally discriminated against the plaintiff.' " Aikens, 460 U.S. at 715, 103 S.Ct. at 1482, quoting Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981). Of course, the fact that Johnson is a white male is irrelevant to his quantum of protection under Title VII. E.g., McDonald v. Santa Fe Trail Transportation Co., 427 U.S. 273, 280 & n. 8, 96 S.Ct. 2574, 2579 & n. 8, 49 L.Ed.2d 493 (1976). "[A] plaintiff's ultimate burden of persuasion remains the same regardless of race [or sex]: he must prove that the defendant intentionally discriminated against him." Lanphear v. Prokop, 703 F.2d 1311, 1315 (D.C.Cir.1983).
 
 
 43
 In McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) (McDonnell Douglas ), the Supreme Court first comprehensively addressed "the order and allocation of proof in a private, non-class action challenging employment discrimination." Id. at 800, 93 S.Ct. at 1823. At the time, and later, the Court recognized that "[t]he facts necessarily will vary in Title VII cases, and the specification ... of the prima facie proof ... is not necessarily applicable in every respect to differing factual situations." Id. at 802 n. 13, 93 S.Ct. at 1824 n. 13, quoted in Furnco Construction Corp. v. Waters, 438 U.S. 567, 575-76, 98 S.Ct. 2943, 2948-49, 57 L.Ed.2d 957 (1978) (Furnco ). The three stages of proof presentation and burden shifting under McDonnell Douglas entail no trifurcation of trial, but simply provide courts with "a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination." Furnco, 438 U.S. at 577, 98 S.Ct. at 2949; see generally B. Schlei & P. Grossman, Employment Discrimination Law 1321-22 (2d ed. 1983).
 
 
 44
 A Title VII plaintiff carries "the initial burden under the statute of establishing a prima facie case of racial discrimination." McDonnell Douglas, 411 U.S. at 802, 93 S.Ct. at 1824. Johnson had to show that sex was the likely reason for the denial of his job opportunity. See Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 252-53, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981) (Burdine ); Hagans v. Andrus, 651 F.2d 622, 625 (9th Cir.), cert. denied, 454 U.S. 859, 102 S.Ct. 313, 70 L.Ed.2d 157 (1981); White v. City of San Diego, 605 F.2d 455, 458 (9th Cir.1979). When this burden is met by the employee, it "creates a rebuttable 'presumption that the employer unlawfully discriminated against' him." Aikens, 460 U.S. at 714, 103 S.Ct. at 1481, quoting Burdine, 450 U.S. at 255, 101 S.Ct. at 1094.
 
 
 45
 At this juncture of the McDonnell Douglas analysis, the question arises whether the use of an affirmative action plan to rebut a charge of employer discrimination is properly part of the plaintiff's prima facie case or whether it should be considered as a separate affirmative defense subsequent to the McDonnell Douglas analysis. If analyzed under the traditional McDonnell Douglas test, once a Title VII plaintiff establishes a prima facie case, "[t]he burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason" for the actions that inspired the complaint. McDonnell Douglas, 411 U.S. at 802, 93 S.Ct. at 1824. To rebut the presumption against him, therefore, the employer must "produc[e] evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, non-discriminatory reason." Burdine, 450 U.S. at 255, 101 S.Ct. at 1094, quoted in Aikens, 460 U.S. at 714, 103 S.Ct. at 1481 (emphasis added). The only burden shifted to the employer is the burden of going forward with evidence that suggests a legitimate defense of his actions. Meeting this burden puts the trier of fact "in a position to decide the ultimate factual issue in the case." Aikens, 460 U.S. at 715, 103 S.Ct. at 1482; see also Knutson v. Boeing Co., 655 F.2d 999, 1001 (9th Cir.1981) (employee retains the ultimate burden of showing intentional discrimination).
 
 
 46
 Under a McDonnell Douglas analysis, one legitimate reason an employer may offer to rebut the discrimination presumption, and fulfill his burden of going forward, is a bona fide affirmative action plan. See, e.g., Hunter v. St. Louis-San Francisco Railway Co., 639 F.2d 424, 426 (8th Cir.1981). The employer must articulate the reasons for rejection clearly, and do so through admissible evidence. See Burdine, 450 U.S. at 255 & n. 9, 257-58, 101 S.Ct. at 1095-96. When the employer has articulated a reason and rebutted the employee's prima facie case, "the factual inquiry proceeds to a new level of specificity." Id. at 255, 101 S.Ct. at 1094. The employee must have an "adequate 'opportunity to demonstrate that the proffered reason was not the true reason for the employment decision,' but rather a pretext." Aikens, 460 U.S. at 716 n. 5, 103 S.Ct. at 1482 n. 5, quoting Burdine, 450 U.S. at 256, 101 S.Ct. at 1095; see McDonnell Douglas, 411 U.S. at 807, 93 S.Ct. at 1826. As long as the employee has this opportunity, the trial court must then decide whether there has been impermissible discrimination.
 
 
 47
 In this case, the Agency offered an affirmative action plan and other evidence to rebut the presumption that its decision was sex-based. Mere presentation or articulation of any plan, of course, will not rebut the presumption. The employer must show sufficient facts suggesting a legal, bona fide affirmative action plan meeting the minima defined in United Steelworkers of America, AFL-CIO-CIC v. Weber, 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979) (Weber ), and the law of our own circuit applying Weber, La Riviere v. EEOC, 682 F.2d 1275 (9th Cir.1982). The plaintiff's only Title VII burden of persuasion is to prove discrimination. He need not prove the illegality of an affirmative action plan merely alleged by his employer, or one for which his employer has not produced evidence to meet the prima facie requirements of a bona fide plan. The employer's burden is to go forward with evidence of a legal plan, and it is in his best interest carefully to present the fullest evidence possible.
 
 
 48
 There is an alternative way to analyze an affirmative action plan: as a separate affirmative defense raised by the employer. This is not a distinction without a difference. The burden of proof under the McDonnell Douglas test never shifts from the plaintiff. The burden of proof to demonstrate the validity of a separate affirmative defense rests with the person asserting it: the employer in Title VII cases. It is logical to require the employer to prove the validity of its plan since it is the employer's plan that has allegedly caused a Title VII injury.
 
 
 49
 The statute already provides a similar type of analysis for one aspect of sex discrimination. Title VII provides a narrow exception that allows classifications or treatment based on sex, but only if sex is "a bona fide occupational qualification reasonably necessary" to an employer's operation. 42 U.S.C. Sec. 2000e-2(e)(1). That statutory exception takes the form of an affirmative defense for the employer: if the court disbelieves his proffered reasons, he may admit discrimination between employees on the basis of sex but argue that the discrimination was justified. See generally K. Davidson, R. Ginsburg & H. Kay, Sex-Based Discrimination 667-95 (1974); Sirota, Sex Discrimination: Title VII and the Bona Fide Occupational Qualification, 55 Tex.L.Rev. 1025 (1977).
 
 
 50
 Thus, if affirmative action plans are presented as affirmative defenses, the burdens of going forward and persuasion dictated by Supreme Court and Ninth Circuit precedent form a simple and logical framework for deciding these difficult issues. This approach seems to me to provide a better means of analyzing affirmative action plans.
 
 
 51
 The majority does not discuss this problem, but concludes without analysis that the employer need only show "some evidence" that the plan was in response to a conspicuous work force imbalance and that the plan is reasonably related to the plan's remedial purposes. (At p. 1310 n. 2.) Then the plaintiff must prove the plan is invalid. I disagree with this analysis. In addition, all that is required by the majority's holding is to vacate the judgment to allow the district judge to apply these new pronouncements on burdens of proof and persuasion. The subsequent broad pronouncements on whether the plan passes muster under Weber are premature.
 
 
 52
 The record does not indicate clearly whether the district court properly allocated the burdens of going forward and persuasion. Therefore, the record is sufficiently suspect that I would have remanded this case for the proper application of those burdens, and for consideration of the Agency plan as an affirmative defense.
 
 III
 
 53
 The second reason that I write separately is because the district court made insufficient findings on the Agency's affirmative action plan to justify its rejection of the plan.
 
 
 54
 Title VII embodies a broad legal principle of anti-discrimination. In Weber, the Supreme Court held that Title VII does not necessarily preclude voluntary, private affirmative action, and thus carved out a very narrow exception to that principle: it rejects random discrimination against various minorities or whites or males, but allows planned discrimination under very limited circumstances. See 443 U.S. at 200, 99 S.Ct. at 2725. In La Riviere, we did not address the constitutional issue but applied Weber to a voluntary, public affirmative action plan. In each case the result is to sanction some discrimination not otherwise legally conscionable--because based on race or sex--when it aims to remedy purposeful past discrimination.
 
 
 55
 Courts, however, must be careful to "ensure that new forms of invidious discrimination are not approved in the guise of remedial affirmative action." Setser v. Novack Investment Co., 657 F.2d 962, 968 (8th Cir.), cert. denied, 454 U.S. 1064, 102 S.Ct. 615, 70 L.Ed.2d 601 (1981). The bona fides of affirmative action plans must be evaluated carefully if the employer asserts he has treated plaintiff pursuant to one, because Title VII compels us to consider the rights of individuals, not groups. See, e.g., Connecticut v. Teal, 457 U.S. 440, 453-54, 102 S.Ct. 2525, 2534, 73 L.Ed.2d 130 (1982); City of Los Angeles Department of Water and Power v. Manhart, 435 U.S. 702, 708, 98 S.Ct. 1370, 1375, 55 L.Ed.2d 657 (1978).
 
 
 56
 Two overarching questions guide the analysis of plans: "(1) when is it permissible to initiate an affirmative action plan, and (2) what methods may be employed to prefer one race [or sex] over another." Setser, 657 F.2d at 967 n. 4. Although Weber did not exclusively "define in detail the line of demarcation between permissible and impermissible affirmative action plans," 443 U.S. at 208, 99 S.Ct. at 2729-30, it identified at least four factors which La Riviere adapted to public plans. The plan: (1) must aim at breaking down historic patterns of racial or social segregation and hierarchy; (2) may not unnecessarily trammel the interests or employment opportunities of other employees; (3) must not absolutely bar the advancement of other employees; and (4) must remain only a temporary measure aimed at manifest racial or social imbalances. La Riviere, 682 F.2d at 1279-80, citing Weber, 433 U.S. at 208, 99 S.Ct. at 2729.
 
 
 57
 The majority evaluated the Agency's plan in light of the four factor test and concluded that the plan was valid. Since a plan must pass muster under all four factors, a separate analysis of each factor is necessary.
 
 A.
 
 58
 The first question is whether the plan breaks down historic patterns of discrimination. The majority concludes that the Agency's plan was remedial, relying solely on the imbalance in the work force. Although I agree that statistics are useful and probative on this issue, a statistical imbalance should not suffice to satisfy this prong of Weber. An employer should use an affirmative action plan not only for identifying and making whole victims of discrimination, but also to identify and change the discriminatory organizational practices and conditions that initially produce victims. See United States Commission on Civil Rights, Affirmative Action in the 1980s: Dismantling the Process of Discrimination 41 (1981) (Commission Report); cf. Firefighters Local Union No. 1784 v. Stotts, --- U.S. ----, 104 S.Ct. 2576, 2588, 81 L.Ed.2d 483 (1984) (courts can override seniority systems only for each member of minority plaintiff class who was an actual victim of the discriminatory practice and on whom the practice had an individual impact); see generally 29 C.F.R. Sec. 1608.4 (1984). Thus, plans must arise in a remedial context: they must respond to a deep historical problem, rather than to random, insensitive acts of individuals over the years. See, e.g., Weber, 443 U.S. at 198 n. 1, 99 S.Ct. at 2725 n. 1 (citing deliberate racial exclusion as a legitimizing precondition for affirmative action plans in the construction industry, among others).
 
 
 59
 A judicial inquiry demands no official, administrative or judicial determination of discrimination. See Local Union No. 35 v. City of Hartford, 625 F.2d 416, 422 (2d Cir.1980), cert. denied, 453 U.S. 913, 101 S.Ct. 3148, 69 L.Ed.2d 997 (1981). Nevertheless, the employer must be able to point to past or present discriminatory patterns and practices that created the traditional segregation of the job categories in question. Merely "arguable" violations are not enough. Cf. Weber, 443 U.S. at 211, 99 S.Ct. at 2731 (Blackmun, J., concurring).[1] Past discrimination implies some discriminatory cause for the present underrepresentation in the employer's job category and allows the court to go beyond the effects of socially created, accidental differences. Remedies affect causes; as a remedy, a plan must bear a relationship to the causes of discrimination so that it can change the discriminatory organizational practices that initially created victims. See, e.g., Commission Report, supra, at 41.
 
 
 60
 In this regard, statistics that show a conspicuous work force imbalance help greatly: they function as quantitative clues that "raise questions rather than settle them" and pinpoint areas requiring "further investigations into the factors that produce the statistical profile." Commission Report, supra, at 36. These statistical studies, of course, should adjust for demographically relevant variables in their comparisons between the work force and local labor pool. See, e.g., United States v. City of Miami, 614 F.2d 1322, 1352-53 & n. 5 (5th Cir.1980) (Gee, J., dissenting), modified on other grounds, 664 F.2d 435 (1981) (en banc). Because plans are remedial, however, an employer cannot rely on statistics alone as a short-cut around the critical need for causal evaluation and analysis. See Commission Report, supra, at 36. Therefore, I consider the majority's approach too superficial for the analysis required under the first prong of Weber, and disagree with it.
 
 B.
 
 61
 The second inquiry is whether the plan unnecessarily trammels the interests of non-minority employees. A bare affirmation that the more reasonably the plan relates to its remedial purpose in specifics, see, e.g., Ende v. Board of Regents of Northern Illinois University, 565 F.Supp. 501, 507 & n. 3, 509 (N.D.Ill.1983), the less chance it will so invade "the interests of majority workers that it violates Title VII," Parker v. Baltimore & Ohio Railroad Co., 652 F.2d 1012, 1016 (D.C.Cir.1981), is insufficient. We must scrutinize carefully the reasonableness of the plan's measures to prevent the majority employees from having their "rights ... bartered away by the employer in order to buy his private peace." City of Miami, 614 F.2d at 1352 n. 3 (Gee, J., dissenting). At the most obvious level, therefore, a plan may not simply "require the discharge of white workers and their replacement with new black hirees." Weber, 443 U.S. at 208, 99 S.Ct. at 2730; accord La Riviere, 682 F.2d at 1279. More generally, the plan may not unnecessarily close off channels of employment to non-minorities. See Parker, 652 F.2d at 1014. A court's serious evaluation of a plan's measures can settle such questions as whether it in reality uses a "quota" rather than a "goal," and can establish the reasonableness of the plan with respect to non-minority employees. The record does not demonstrate such an inquiry. Therefore, I conclude that the majority is not in a position to pass on this issue.
 
 C.
 
 62
 The third issue to be addressed is whether the plan absolutely bars the advancement of non-minority employees. This inquiry is closely related to the one above, and the answer will depend on several factors, including the number and nature of the applicants, the number of contested jobs available, and employee expectations. The affirmative action program in Weber did not deprive white employees of opportunities for advancement, but created new opportunities by establishing a training program for both blacks and whites. Weber, 443 U.S. at 198, 99 S.Ct. at 2724. Thus, although "black employees receiv[ed] training in preference to senior white employees," id. at 199, 99 S.Ct. at 2725, the expansion of opportunities previously limited by seniority prevented any problem. See also La Riviere, 682 F.2d at 1280. Under Weber, the safest plans minimize non-minority employee displacement and do not concentrate the costs of affirmative action "upon a relatively small, ascertainable group of non-minority persons." EEOC v. Local 638, 532 F.2d 821, 828 (2d Cir.1976); cf. Gewirtz, Remedies and Resistance, 92 Yale L.J. 585, 605 (1983) (effective remedies must operate within third-party cost constraints). The district court did not analyze this issue sufficiently, and I would have remanded this case for a more detailed consideration.
 
 D.
 
 63
 The final question is whether the plan remains only a temporary measure. The majority concluded that the plan was temporary because it did not state expressly that it would be permanent, and purported to attain rather than to maintain a sexual balance. Thus, the majority concludes that Weber endorses all plans which do not admit to being permanent, but which end when their goals are met. This interpretation of Weber is too broad, and reads the temporary requirement out of the test by making it a hurdle over which any artfully drawn plan can jump. The saving grace of the plans in Weber and La Riviere was their expressly temporary duration. See Weber, 443 U.S. at 208-09, 99 S.Ct. at 2729-30; La Riviere, 682 F.2d at 1280. Moreover, a broad reading of Weber is unnecessary in this case. The disputed facts in the record, particularly Graebner's testimony, does not justify the majority's conclusion that the plan was temporary. An appellate court is not in a position to make this factual determination. The district court should have the opportunity to weigh this evidence properly, and I would remand this case for further factual hearings.
 
 IV
 
 64
 In conclusion, the record demonstrates that the district court evaluated the Agency's 1978 plan, although it did consider newer Agency and county-wide plans. The relevant plan, of course, is the one the Agency applied to the allegedly adverse employment decision. I would have remanded this case for the district court to reconsider the plan as an affirmative defense of the Agency under the proper allocation of burdens discussed above. The district court then should have reviewed the aspects of the appropriate plan under a detailed Weber analysis to create an appropriate record for review. See Parker, 652 F.2d at 1020; cf. Pullman-Standard v. Swint, 456 U.S. 273, 291, 102 S.Ct. 1781, 1791, 72 L.Ed.2d 66 (1982) (when "a district court has failed to make a finding because of an erroneous view of the law, ... there should be a remand for further proceedings to permit the trial court to make the missing findings").
 
 
 65
 I concur in the result reached by the majority opinion because I believe that the district court erred by misallocating the burdens of persuasion and proof, and a judgment based on such a record should not stand. I cannot join this opinion, however, because I disagree with the majority's allocation of the burdens of persuasion and production, and because I believe that the district court should have the first opportunity to correct its own errors and conduct the intensive factual analysis necessary to resolve these issues. In order for the majority to uphold the plan, it has taken several unnecessary doctrinal steps that weaken the Supreme Court's test in Weber as interpreted by La Riviere. From these pronouncements, I dissent.
 
 
 
 [1]
 Although there is state action in this case, see e.g., Virginia v. Rives, 100 U.S. (10 Otto) 313, 318, 25 L.Ed. 667 (1880), Johnson did not challenge the affirmative action plan on equal protection grounds and we do not reach the issue
 
 
 [2]
 The district court's opinion is not entirely clear as to whether it inappropriately placed the burden of persuading the court of the plan's validity on the employer. The Supreme Court's decision in McDonnell Douglas v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1972) explains the order and burdens of proof in a typical Title VII case. First the plaintiff must present a prima facie case of discrimination. McDonnell Douglas, 411 U.S. at 802, 93 S.Ct. at 1824. Then the employer must articulate a legitimate, nondiscriminatory reason for its decision. Id. The plaintiff then must convince the court that the employer's proffered reasons were actually a pretext for discrimination. McDonnell Douglas, 411 U.S. at 804-05, 93 S.Ct. at 1825
 We agree with the Eighth Circuit's analysis in Setser v. Novack Investment Co., 657 F.2d 962 (8th Cir.) (en banc), cert. denied, 454 U.S. 1064, 102 S.Ct. 615, 70 L.Ed.2d 601 (1981), which applied the McDonnell Douglas formula to an affirmative action case. In order to meet the burden of articulating a nondiscriminatory reason for its hiring decision, the employer need only produce "some evidence that its affirmative action plan was a response to a conspicuous ... imbalance in its work force" and "some evidence that its affirmative action plan is reasonably related to the plan's remedial purpose." Setser, 657 F.2d at 968. Once an employer has produced evidence that its refusal to hire the plaintiff was a consequence of its implementation of the plan, the employer is entitled to judgment unless the plaintiff proves the plan is invalid. Setser, 657 F.2d at 962.
 We disagree with the dissent's analysis that the employer's assertion that it made its hiring decision pursuant to its affirmative action plan is an affirmative defense imposing a burden of going forward and persuading (as contrasted to a burden of production). However, in this case, the employer has met the higher burden--the plan is bona fide, meets the tests of Weber, and responds to a need to correct an overwhelming imbalance in the work force (all of the Agency's 238 skilled craft positions were held by men until Joyce was hired, making it 237 to 1).
 
 
 [3]
 Yet it is not clear that the Weber plan was any more expressly limited than the Agency plan. "The 'Joint Committee' thereafter entered into a 'Memorandum of Understanding' which established a goal of thirty-nine percent as the percentage of minorities that must be represented in each 'craft family' at the Kaiser Gramercy plant." Weber v. Kaiser Aluminum & Chemical Corp., 415 F.Supp. 761, 764 (E.D.La.1976) (footnotes omitted), cited in Weber, 443 U.S. at 199, 99 S.Ct. at 2725
 
 
 [4]
 Although the district court rejected the Agency plan as a defense on the ground that it was not shown to be temporary, it also expressed doubt as to the plan's remedial intent. This concern hinged upon the court's finding that "[t]he Transportation Agency has not discriminated in the past, and does not discriminate in the present against women in regard to employment opportunities in general and promotions in particular." The district court apparently assumed that an employer must show his own history of purposeful discriminatory patterns or practices. An employer need not make any such showing. Thus, the district court's factual finding of no past or present discrimination against women by this employer is irrelevant to the issue of the validity of the affirmative action program
 
 
 [5]
 Citing Justice Blackmun's concurrence in Weber, the dissent contends, "Merely 'arguable' violations are not enough" to warrant affirmative action. The dissent misstates the law and incorrectly cites both the Weber plurality and Justice Blackmun's concurrence. Justice Blackmun actually wrote separately to endorse the theory that "voluntary affirmative action be a reasonable response to an 'arguable violation' of Title VII." 443 U.S. at 211, 99 S.Ct. at 2731. His position was narrower than the plurality's, not broader: "The Court, however, declines to consider the narrow 'arguable violation' approach and adheres instead to an interpretation of Title VII that permits affirmative action by an employer whenever the job category in question is 'traditionally segregated.' " 443 U.S. at 212, 99 S.Ct. at 2731. Two hundred and thirty eight to zero suffices to show such segregation
 However, were a showing of arguable violation required, we suggest that two hundred and thirty eight to zero suffices to show that too (were Ms. Joyce the plaintiff here, the job having gone to Mr. Johnson, the statistics would make a prima facie case of discrimination).
 
 
 [1]
 The majority accuses me of "misstat[ing] the law and incorrectly cit[ing]" both Weber and Justice Blackmun's concurrence. Majority op. at 758, n. 5. A careful reading of my dissent will demonstrate no misstatement of the law
 It is true that Justice Blackmun concluded that the Weber plurality rejected an "arguable violation" approach in favor of a "traditional segregation" approach. This, however, is precisely my point--that more than an "arguable violation" is required. By using the term "traditionally segregated job categories," Weber, 443 U.S. at 209, 99 S.Ct. at 2730 (emphasis added) (footnote omitted), the Court incorporated a requirement that a showing of past discrimination must be made. See Janowiak v. City of South Bend, 750 F.2d 557, 562 (7th Cir.1984).
 Not only have I correctly cited the law but, to the extent that the majority opinion holds that a mere statistical disparity suffices to show that a job category was "traditionally segregated," it is contrary to both Weber and Janowiak. Although one may argue whether a finding of two hundred and thirty-eight males to one female suffices to show sex-based segregation, the ratio alone is insufficient to show a pattern of traditional sex-based segregation.