797 F.2d 191
 41 Fair Empl.Prac.Cas. 772,
41 Empl. Prac. Dec. P 36,462, 55 USLW 2121
 Gary Calvin LILLY, Appellee,
v.
CITY OF BECKLEY, WEST VIRGINIA; City of Beckley Police
Civil Service Commission; Beckley Police
Department, Appellants,
and
J.C. Higgins; Tim Thompson; Arthur Goldstein; Thomas
Durrett; John McCulloch, Defendants.
 No. 85-1650.
 United States Court of Appeals,
Fourth Circuit.
 Argued Feb. 5, 1986.
Decided Aug. 7, 1986.
 
 N. Robert Grillo (Gorman, Sheatsley & Hutchison, L.C., Beckley, W. Va., on brief) for appellants.
 Keven B. Burgess (Hamilton & Mooney, Oak Hill, W. Va., on brief) for appellee.
 Before PHILLIPS and SPROUSE, Circuit Judges, and HAYNSWORTH, Senior Circuit Judge.
 JAMES DICKSON PHILLIPS, Circuit Judge:
 
 
 1
 The City of Beckley, West Virginia (Beckley, the City) appeals from a judgment of the district court, 615 F.Supp. 137, that, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. Sec. 2000e et seq., it engaged in illegal "reverse discrimination" when it denied Gary Lilly, a white male, employment as a police officer. We affirm.[1]
 
 
 2
 * In January 1974, Gary Calvin Lilly, then a police officer in Oak Hill, West Virginia, applied to become a police officer in Beckley, West Virginia. Lilly is a white male college graduate. At that time, the Beckley Police Civil Service Commission used a hiring-testing procedure that involved a twenty-seven page application, a four-part standard test prepared by the Public Personnel Association of Chicago, a psychological test, a polygraph exam, a background investigation, and a physical exam prior to an interview. Lilly passed the test and was offered a position as a police officer. He turned down the job.
 
 
 3
 In 1975 the City of Beckley undertook to remedy the lack of minority race and women employees in a number of City departments. James Karantonis of the West Virginia Human Rights Commission was assigned to assist the City in correcting, in particular, the race and gender imbalance in the City police force, which at that time was composed entirely of white males.
 
 
 4
 The City adopted a formal affirmative action program in April 1976 that provided for recruitment of members of racial minorities without preferential hiring. The plan applied to all City hiring, including the police force, and incorporated provisions for annual review of the City's affirmative action accomplishments. This formal plan had not come into being in January 1976, however, when the Beckley Police Civil Service Commission (the Commission) advertised that it would conduct testing for job openings in the police department on January 27 and 28, 1976.
 
 
 5
 Under an immediate threat of the loss of federal and other law enforcement funds, the City and the Commission drastically altered the testing and certification procedures to be used in the January testings. The application was reduced to one page, and the objective, multiple choice written exam was discarded in favor of a two-part essay exam. This essay examination asked each applicant to describe (1) how he could use his skills and abilities in the best interests of the department and the community, and (2) how he saw himself in five years as a member of the department. There was also an interview. There were no objective criteria for assessing performance on the written or oral elements of the application procedure. An applicant who passed the first two steps filled out a more detailed application and underwent a background check.
 
 
 6
 Lilly applied in January 1976 to become a Beckley police officer. Although he met the requirements for employment and passed the essay test, he failed the interview. During his interview, which was conducted with a single member of the Commission, Lilly was told that his chance of obtaining employment would be much better if he were a member of a minority race.[2] Following completion of the application procedure, the Commissioners certified a list of names to the mayor, who appointed persons from the list to become police officers.
 
 
 7
 Believing that he had been unlawfully discriminated against, Lilly sought relief before the West Virginia Human Rights Commission and the Equal Employment Opportunity Commission, each of which found no reasonable basis for his charges. He commenced this action in the district court in 1980. After a bench trial, the court found the facts generally as outlined above. The district court also found that the City had conceded that Lilly was not certified for employment because of his race and sex. At trial, the City defended the employment decision on the ground that it was made pursuant to an affirmative action plan.[3] The district court found specifically that the decision not to hire Lilly was not made pursuant to the City's April 1976 formal affirmative action plan, but in accordance with an informal plan the particulars of which were not proven by the City at trial. Because this informal January 1976 plan did not contain any safeguards of the sort that insulate action taken pursuant to voluntary plans from Title VII liability, the district court entered judgment for Lilly. The court ordered that Lilly be offered the next opening on the Beckley police force, and awarded back pay of nearly $37,000 and attorneys fees of $7,500. This appeal followed.
 
 II
 
 8
 Although Title VII's prohibition of race discrimination in employment applies to members of racial majorities as well as minorities, the statute does not flatly prohibit the implementation of voluntary affirmative action programs designed to remedy past discrimination against racial minorities and the resulting racial imbalances. United Steelworkers of America v. Weber, 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979). The Weber Court recognized that voluntary affirmative action programs might be necessary and proper means for realizing the purposes of Title VII under certain conditions. If those conditions are met, the resulting adverse impact upon members of a racial majority would not, therefore, violate Title VII's prohibitions against racial discrimination in employment practices. On the other hand not every "affirmative action" plan should insulate an employer against charges of race discrimination by directly affected members of a racial majority.
 
 
 9
 The conditions which were held in Weber to have validated the employer's affirmative action plan as a justifying nondiscriminatory reason for the challenged conduct were that the plan was designed to break down proven patterns of racial discrimination in employment, did not unnecessarily trammel the interests of majority race members, did not create an absolute bar to the advancement of majority race employees, and was a temporary measure "not intended to maintain racial balance, but simply to eliminate a manifest racial imbalance." 443 U.S. at 208, 99 S.Ct. at 2730.
 
 
 10
 Inevitably, courts now assess the bona fides of affirmative action plans challenged as justifying decisions in reverse-discrimination actions by applying a test drawn from Weber. This inquires whether the plan contains safeguards necessary to avoid trammelling the rights of non-minorities, whether the plan is designed to remedy past discrimination, and whether the plan is temporary. See Johnson v. Transportation Agency, 770 F.2d 752 (9th Cir.1985) (a permanent plan to maintain balance is impermissible, but a plan of limited duration intended to attain balance is permissible); Bratton v. City of Detroit, 704 F.2d 878 (6th Cir.1983) (applying the Weber standards to find affirmative action plan permissible); Setser v. Novack Investment Co., 657 F.2d 962 (8th Cir.1981) (en banc) (plan must be reasonably related to its remedial purpose, bona fide plan entitles employer to judgment as a matter of law); Lehman v. Yellow Freight System, Inc., 651 F.2d 520 (7th Cir.1981) (informal voluntary plan must contain adequate safeguards, plan in this case invalid).
 
 
 11
 So the district court in this case proceeded. After first holding that Lilly made out a prima facie case of race discrimination in hiring under McDonnell Douglas Corp. v. Green, 411 U.S. 792, 95 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the court applied the Weber test to conclude that Beckley had failed to show a legitimate non-discriminatory reason for its employment decision. Specifically, the court found as facts that the affirmative action plan in force at the time of Lilly's application was an informal plan, and not the formal plan adopted by the City in April 1976, and that the City had not proven the particulars of the informal plan in effect in January. The court also found that the City had not shown that the plan did not result in the hiring of unqualified applicants or that the plan was temporary. The court concluded on this basis that the City had failed to show that its affirmative action plan was reasonably related to the asserted remedial purpose of the plan.
 
 
 12
 We are bound by the district court's factual findings unless we can determine that they are "clearly erroneous." Fed.R.Civ.P. 52(a). This means that "If the district court's account of the evidence is plausible in light of the record viewed in its entirety," we must defer to its findings on that evidence. Anderson v. City of Bessemer City, 470 U.S. 564, 105 S.Ct. 1504, 1511-13, 84 L.Ed.2d 518 (1985). We are unable to conclude here that the court's critical factfindings are clearly erroneous under the Anderson test, and therefore accept them.
 
 
 13
 Beckley argues that the district court erred in finding that Beckley failed to show goals or timetables for the affirmative action plan. The City contends that this finding is error because the formal plan of the City, adopted in April 1976, provides for annual review of the City's employment practices. While we agree that express statements of fixed duration and precise numerical goals are not necessary elements of a bona fide, voluntary, affirmative action plan, see Johnson v. Transportation Agency, 770 F.2d 752 (9th Cir.1985), that principle does not obtain here. The general provision for annual review of employment practices under the City's formal April plan does not save the separate, informal plan upon which the City's police commissioners took the challenged action months earlier. Because the later plan did not come into being until after the decision not to recommend Lilly for employment was made, the district court's finding that the City acted pursuant to the informal plan must be accepted. There was no evidence before the court that the January plan had any formal attributes, or that it contained any express or implied goals or timetables that would permit the district court to find that it contained safeguards of the sort contemplated by Weber.
 
 
 14
 As in Lehman v. Yellow Freight System, Inc., 651 F.2d 520 (7th Cir.1981), the employer in this case acted pursuant to an informal affirmative action program that has not been shown to have balanced adequately the societal interest in affirmative action and the right of individuals under Title VII to be free from race discrimination in employment. Weber represents an accommodation of the principle that past discrimination against racial minorities should be rectified with the need for substantive and procedural safeguards for racial majorities in implementation of affirmative action plans. Time limitations and numerical goals are obvious means by which the safeguards insisted upon in Weber can be realized. Weber, 443 U.S. at 208, 99 S.Ct. at 2730. Here, they were simply not shown to have been in place at the critical time. Instead, the evidence unmistakably showed, as the district court found, that the City of Beckley, in apparent reaction to an imminent threat to law enforcement funding, permitted its police commissioners to implement an unstructured, open-ended affirmative action plan with only the most general goal of "doing something" to avoid economic sanctions for alleged past discriminatory practices. While the City's action in January 1976 may have been an understandable good faith effort to get started with a plan yet to be firmed up, it cannot be held under Weber[4] to have justified the challenged employment decision against Lilly.[5]
 
 III
 
 15
 The district court awarded Lilly $36,973.09 in back pay, which was calculated as the difference between what Lilly earned in his principal occupation from 1976 until the date of judgment and the amount Lilly would have earned as a Beckley police officer. The City contends that the damage award is excessive. It argues that the district court erred by refusing to offset Lilly's earnings during the relevant period from secondary jobs.
 
 
 16
 Title VII's damages provision states that "[i]nterim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable." 42 U.S.C. Sec. 2000e-5(g). Courts addressing the moonlighting issue have indicated that if the plaintiff could have held both the supplemental job and the job he did not receive because of discrimination, the earnings from the supplemental job will not be used to reduce the back pay award. See Whatley v. Skaggs Cos., 707 F.2d 1129, 1139 (10th Cir.1983) (where plaintiff could not have held both supplemental job and job he lost because of discrimination, moonlighting earnings are "interim earnings); Bing v. Roadway Express, Inc., 485 F.2d 441, 454 (5th Cir.1973) (same; indicating that if plaintiff could have held both jobs, then supplementary job is not "interim," but assumes "permanent" nature); Falls Stamping & Welding Co. v. International Union, 485 F.Supp. 1097, 1103 (N.D. Ohio 1979).
 
 
 17
 The district court specifically held that the City was "not entitled to an offset from secondary employment inasmuch as [Lilly] proved to the court's satisfaction that [the moonlighting] earnings could have been achieved had he been hired as a police officer." This factual finding is supported by the record, and the district court therefore properly concluded that Lilly's damages should not be reduced by the amount of money that Lilly earned from secondary employment.[6]
 
 
 18
 AFFIRMED.
 
 
 
 [1]
 Lilly also originally made a parallel claim under 42 U.S.C. Sec. 1983 that the City's failure to hire him violated his constitutional right to equal protection of the laws. That claim was dismissed on statute of limitations grounds and that ruling is not challenged on this appeal. In consequence, and because in any event we find a statutory violation under Title VII, we need not and do not address the question whether the equal protection clause might impose more stringent restrictions on public employers' "affirmative action" programs than does Title VII. Cf. Wygant v. Jackson Board of Education, --- U.S. ----, ----, n. 9, 106 S.Ct. 1842, 1851, n. 9, 90 L.Ed.2d 260 (1986) (equal protection challenge to public employer's affirmative action plan invokes "suspect classification/compelling governmental interest/narrowly tailored means" test; distinction from challenges to private employer plans noted)
 
 
 [2]
 At trial, Lilly testified that Thompson, the Commissioner who interviewed him, informed him that his chance of receiving a job was " 'about as much chance as a snowball in hell.' " Lilly testified that Thompson explained that because federal funds were involved, "the bulk of [the police positions] ... would employ blacks and minorities."
 Thompson himself testified that his statements to Lilly were to the effect "Gary, don't get your hopes up because the monies that we have to hire policemen is [sic] being furnished by CETA and we have been more or less instructed that we have to hire blacks, females, chicanos, and your chances aren't too good."
 
 
 [3]
 On this appeal, and in earlier proceedings, the City urged two other justifications for the failure to hire Lilly. First, at the time of his application Lilly was not a resident of Beckley, as City police officers were required to be. At trial, there was no evidence to indicate that this factor was ever considered by any of the persons who made the decision not to certify Lilly for employment as a police officer in 1976. Second, Lilly became a candidate later in 1976 for a magistrate's position, and it was the policy of the City that candidates for elective office could not also be police officers. Again, there was no evidence that this factor was considered by any of the decisionmakers, and in any event, the evidence showed that Lilly did not become a candidate for the magistrate position until after he failed the interview
 
 
 [4]
 In two recent cases decided since this appeal was submitted, the Supreme Court has observed that, in general, affirmative action hiring plans may be more tolerable under both constitutional and statutory challenges than are remedial plans adversely affecting nonminority employees (e.g., in promotions and lay-offs). Wygant v. Jackson Board of Education, --- U.S. ----, ----, 106 S.Ct. 1842, 1849-53, 90 L.Ed.2d 260 (U.S. May 19, 1986) (distinction noted in upholding constitutional challenge to voluntary lay-off plan disfavoring nonminority employees); Local 28 of the Sheet Metal Workers International Association v. EEOC, --- U.S. ----, ----, 106 S.Ct. 3019, 3051-52, 92 L.Ed.2d 344 (1986) (distinction noted in rejecting constitutional and statutory challenges to court-ordered plan for minority admissions to union membership); Id. at ----, 106 S.Ct. at 3053 (Powell, J., concurring) (same; equating union admission goals with hiring goals)
 But there is no suggestion in these decisions that hiring plans such as that here in issue must not yet pass muster under Weber's statutory, or Wygant's constitutional, tests. Indeed, Justice Powell, who made the basic point in writing for the plurality in Wygant, --- U.S. at ----, 106 S.Ct. at 1849-53 later took the occasion, concurring in Local 28, to caution that though there is a distinction, it is not sufficient to immunize hiring plans from the basic inquiries. --- U.S. at ----, n. 3, 106 S.Ct. at 3026 n. 3.
 
 
 [5]
 We have considered the City's other allegations of error, and find them to be without merit. In particular, that the West Virginia Human Rights Commission and the Equal Employment Opportunity Commission found that Lilly's charges were without merit did not require the district court, which acted upon a more complete record, to defer to the conclusions of those agencies
 Second, the City suggests that because Lilly turned down employment as a Beckley police officer in 1974 he was not really seeking the job in 1976, and therefore failed to make out this element of a prima facie case under Title VII. At trial, however, Lilly explained that changed financial circumstances made the Beckley job more attractive in 1976. The district court did not commit clear error in finding that Lilly sought employment as a Beckley police officer in 1976.
 
 
 [6]
 The district court also awarded Lilly attorneys fees, a remedy within the discretion of the district court as provided in 42 U.S.C. Sec. 2000e-5(k). Although the City challenges this decision by the district court, it fails to persuade us--indeed advances no significant argument--that the district court abused its discretion